BRICKHOUSE v. HILL.

ARLITT v. HILL.

Opinion delivered February 16, 1925.

1. STATUTES—ADOPTED CONSTRUCTION.—Where a law is taken from the laws of another State, it is presumed to be taken with the previous construction given that law in that State.

2. WORDS AND PHRASES—"MEASURE."—Under Amendment 7 to the Constitution, providing that "any measure referred to the people shall take effect and become a law when it is approved by a' majority of the votes cast thereon," the term "measure" includes a constitutional amendment initiated by the people.

3   COURTS—STARE DECISIS—In construing constitutional provisions, while courts recognize, to the fullest extent, the necessity for stability, consistency and a firm adherence to the doctrine of stare decisis, yet, if an error has plainly been committed, and no property rights are involved, they will not decline to correct it, even though it may have been asserted and acquiesced in for many years.

4. STATUTES—CONSTRUCTION.—Words used in relation to the submission of a question to election should be given their legal, rather than their ordinary, signification.

5. CONSTITUTIONAL LAW—ADOPTION OF CONSTITUTIONAL AMENDMENT —MAJORITY.—All doubt as to the number of votes necessary to adopt a constitutional amendment was settled by Amendment No. 13, adopted in 1920, providing that any measure submitted to the people shall become a law when approved by a majority of the votes cast upon such measure, and defining "measure" as including constitutional amendments.

6. CONSTITUTIONAL LAW—REPEAL OF CONSTITUTIONAL AMENDMENT.— Submission in 1922 and defeat of an amendment similar to amendment No. 13, the Initiative and Referendum Amendment adopted in 1920, did not have the effect of repealing Amendment No. 13.

7. CONSTITUTIONAL LAW—CONSTRUCTION OF AMENDMENT.—The initiative and referendum amendment, No. 13, must be construed as though introduced in place of Const. art. 19, § 22, and the words "as herein provided" mean "as provided by the Constitution," and hence the amendment applies both to amendments initiated and to those submitted by the Legislature.

8. CONSTITUTIONAL LAW—ADOPTION OF AMENDMENTS.—Constitutional amendments Nos. 10, 11 and 12 were legally adopted by a majority of the electors voting thereon, though less in number than a majority of the votes cast at the general election in 1924.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

*John F. Clifford, E. R. Parham* and *J. H. Carmichael,* for appellant.

If it be admitted that, under art. 19, § 22, of the Constitution of 1874, in order to adopt an amendment there must have been a majority of all votes cast at the election, nevertheless that rule was changed by the Initiative and Referendum Amendment, now known as No. 7, and should have changed the rule of decision, as was done in the "anti-trust cases," 76 Ark. 303. There can be no question, in the light of the "history of the times," from the decision in *Rice* v. *Palmer,* 78 Ark. 432, in 1906 to the adoption of the I. and R. Amendment in 1910, but that this amendment intended to put beyond dispute for all time the question of the number of votes required to adopt an amendment. It is equally clear, from the discussions preceding the election, and the fact that the term "measure" was one of the questions raised in these discussions, that that word, as used in the amendment covers amendments to the Constitution. In a long line of decisions our Supreme Court has recognized the change and the effect of the I. and R. Amendment, and, in one way or another, every present member thereof has held that a majority vote cast upon the question was sufficient. All the courts that have passed on the word "measure" since the decision in *Hildreth* v. *Taylor,* 117 Ark. have held that it included amendments. 106 Ark. 56, dissenting opinion; 103 Ark. 48 *Id.* 452; 110 Ark. 528; 117 Ark. 266; 104 Ark. 510 *Id* 583; 105 Ark. 380; 156 Ark. 509; 151 Ark. 369; 110 Ark. 528; 143 Ark. 203; 145 Ark. 143. The Initiative and Referendum Amendment in the use of the words, "any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise," is not ambiguous, and requires only a majority of those voting on the question. 78 Ark. 432, 452, 455, dissenting opinions;

45 Ark. 400; 69 Ark. 336; 60 Ark. 343; 49 Ark. 376; 95
U. S. 360; 111 U. S. 556; 68 Md. 146; 104 Ky. 629; 20
Wis. 572; 5 N. Dak. 594; 20 Ore., 154; 130 N. Y. 319;
1 Wash., 303; 24 Law. Ed. (U. S.) 410; 74 Fed. 532;
60 Conn. 528, 22 Atl. 1016; 147 U. S. 99, 37 Law. Ed.
96; 111 U. S. 263; 28 Law. Ed. 520. In a note to 98
Am. Dec. 673, the general rule is laid down, viz: "a
majority of the legal voters is satified by a majority of
the legal voters voting." 16 Wall. 644. See also 112 U.
S. 268, 28 Law. Ed. 760; 24 Fed. 113; 138 Ind. 516, 37
N. E. 987.

No brief was filed by regular counsel for appellee;
but in his behalf *C. E. Daggett, Jas. E. Hogue* and *Henry
Moore* argued the case orally, and *Cockrill & Armistead*
filed briefs as *amici curiae.*

On behalf of appellant. *J. V. Bourland, Pat Henry,
Joe Harris* and *Williamson* and *Williamson, W. L. Pope,
Capt. Robert W. Brown, J. C. Marshall, W. R. Donham,
Horace Chamberlain, Geo. B. Rose* and *J. F. Loughbor-
ough* filed briefs as *amice curiae.*

In the case of *Arlitt* v. *Hill,*

*Duty & Duty,* for appellant.

*H. W. Applegate,* Attorney General and *Brooks
Hays,* for appellee.

T. C. McRAE, Special Chief Justice. The case of
*Arlitt* v. *Hill,* No. 9014, has been consolidated with the
case of *Brickhouse* v. *Hill,* No. 9011, and in this opinion
reference will only be made to the consolidated case by
the title of *Brickhouse* v. *Hill.*

The appellant, in his capacity as mayor, was pro-
ceeding, by virtue of an ordinance of the city council, to
issue bonds to fund the debt of the city of Little Rock,
under the Constitutional Amendment No. 11, which was
submitted by the General Assembly to the electors of
the State for approval or rejection at the general elec-
tion held in October, 1924. Upon the application and
petition of the appellee, the chancery court of Pulaski
County restrained the appellant from issuing bonds

under said amendment, holding that it had not been approved by the said electors, and the case is before this court on appeal.

So the question involved is: Was amendment No. 11 adopted?

Indirectly, there is involved the same question as to the amendments numbered 10 and 12, proposed by the same General Assembly, and submitted to the electors at the same general election. The votes "For" and "Against" these amendments were as follows:

For Amendment No. 10.................................... 52,151
Against Amendment No. 10................................ 40,955
For Amendment No. 11.................................... 57,854
Against Amendment No. 11................................ 35,449
For Amendment No. 12.................................... 56,910
Against Amendment No. 12................................ 34,174

Total vote for Governor.......................125,760

It will be noticed that neither of the said amendments received the vote of a majority of the electors who voted at said election for Governor, and, under § 22 of article 19 of the Constitution of 1874, as construed by this court in previous decisions, would have failed of adoption if there had been no change in the Constitution as to the number of votes necessary. But each of them received a majority of the votes cast thereon, and, under the Constitution as it now is, and as it was when said Amendments 10, 11 and 12 were submitted and voted upon, they were each adopted at the general election in October 1924. The Amendment No. 11 received a majority of 22,405 of the votes cast thereon.

The several opinions of this court referred to by counsel, some in criticism and some by way of approval, were in cases construing § 22 of article 19 of the original Constitution, before the Initiative and Referendum Amendment No. 7. For the determination of the question in the pending case it is not necessary to overrule any of the cases that have been referred to, except *Hildreth* v. *Taylor,* 117 Ark. 474.

The opinion in that case is largely based upon the premises that Amendment No. 7 was taken from a similar amendment adopted in the year 1902 in the State of Oregon, and that, while there was no judicial construction in Oregon of their amendment, still there was a construction by the people that it did not fix the number of votes on constitutional amendments, as an amendment was adopted in 1906 expressly providing that a majority voting at the election should adopt. This statement follows the familiar rule that, where a law is taken from the laws of another State, it is presumed to be taken with the previous construction given that law in that State. This rule, of course, is sound, and the application here is important.

However, the opinion of our court in that case was erroneous in the statement of the situation in Oregon. The I. and R. Amendment there adopted in 1902, of which our Number Seven is a substantial copy, was before the Supreme Court of Oregon in the year 1908, in *Farrell* v. *Port of Columbia,* 93 Pac. 254, and the court there said that, under the amendment, a majority voting on the question on an initiative amendment decided the election. Prior to the I. and R. Amendment in Oregon, amendments to the Constitution could only be submitted by the General Assembly, and the form was this: A designated majority in the General Assembly proposed the amendment; it then laid over until the next General Assembly, and, if a designated majority of that General Assembly also favored it, it was submitted to the voters at the next election, and, if a majority voting on the question approved, the amendment was adopted. (Section 17, art. 1, original Constitution of Oregon.)

This section was expressly amended in 1906, so that only one General Assembly was required to submit a proposed amendment, and the people then voted on it, and a majority voting on the question adopted it. The I. and R. Amendment did not attempt to change the rule of the old Constitution for submission of amendments by the General Assembly, but expressed the added method

of submission by initiative petition. The rule for the majority vote was the same under both methods of submission.

It is submitted that the error in the opinion in *Hildreth* v. *Taylor,* in the assumption of the construction put upon the I. and R. Amendment in Oregon, was of controlling force in interpreting the language of our Amendment Number Seven.

The other cases may be briefly summarized as follows:

In *Arkansas Tax Commission* v. *Moore,* 103 Ark. 48, it was only decided that the amendment was self-executing, and that the existence of an emergency was a legislative question and not a judicial question.

*State* v. *Donaghey,* 106 Ark. 56, held that Amendment Number Seven repealed the provisions of the original amendment section, in the feature that the time for the advertising was reduced from six months to four months. There was no occasion to decide, and it was not decided, whether or not the time for advertising amendments submitted to the Legislature was changed.

*Ferrell* v. *Keel,* 105 Ark. 380, merely decided that the style of bills, "Be it enacted," etc., was not necessary on bills passed by the General Assembly.

*Whittemore* v. *Terral,* 140 Ark. 493, held that a referendum did not lie to the action of the General Assembly in adopting an amendment to the Federal Constitution.

*Mitchell* v. *Hopper,* 153 Ark. 525, held that the veto power of the Governor did not extend to a resolution of the General Assembly submitting a constitutional amendment.

The act of the Legislature for 1911, providing details for carrying out the purposes of Amendment Number Seven, used the term "measure" in many places in referring to constitutional amendments. The term "measure" is defined in the Century Dictionary as "anything devised or done with the view of the accomplishment of a purpose."

In the case of *The New Jerusalem Proposition*, 26 Okla. 548, Pac. 823, the Supreme Court of Oklahoma, in passing upon an I. and R. Amendment, held that the term "measure" included a constitutional amendment.

### STARE DECISIS.

This court is of the opinion that the decision in *Hildreth* v. *Taylor* is wrong, and that more good than harm would result from changing it at this time. And it is overruled, so far as it is in conflict with this decision. This then makes the law as if *Hildreth* v. *Taylor* had never been decided as it was.

In *Whittington* v. *Flint*, 43 Ark. 513, the court said: "A rule of decision once deliberately adopted and declared ought not to be disturbed 'by the same court, except for very cogent reasons and upon a clear manifestation of error.' But there are cases which 'ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error.'"

The court then overruled five prior decisions. In *Collier* v. *Davis*, 47 Ark. 367, in overruling a prior case, the court said: "It is always a misfortune for a court to change front on a question which may affect property rights acquired since the rule was announced. And it is sometimes doubtful whether more mischief will be produced by adhering to an error, or by retracing it. The case has stood for more than five years, although it was never satisfactory to the profession. It is, however, indefensible in principle, and it was decided against the clear weight of authority."

In the Supreme Court of the United States there have been several cases overruling prior decisions on questions involving the Constitution. *The Legal Tender Cases*, 12 Wall. 457, 554 570, involved a decision of this kind. JUSTICE STRONG of the court said:

"Even in cases involving only private rights, if convinced we have made a mistake, we would hear

another argument and correct our error. And it is no unprecedented thing in courts of last resort, both in this country and in England, to overrule decisions previously made. We agree this should not be done inconsiderately, but, in a case of such far-reaching consequence as the present, thoroughly convinced as we are that Congress has not transgressed its powers, we regard it as our duty so to decide and to affirm both the judgments.''

In the case of the *Propeller Genessee Chief* v. *Fitzhugh,* 12 How. 443, 459, Justice Taney said: ''But the decision referred to has no relation to rights of property. It was a question of jurisdiction only, and the judgment we now give can disturb no rights of property, nor interfere with any contracts heretofore made. The rights of property and of parties will be the same by whatever court the law is administered. And as we are convinced that the former decision was founded in error, and that the error, if not corrected, must produce serious public as well as private inconvenience and loss, it becomes our duty not to perpetuate it.''

In *Pollock* v. *Farmers' Loan & Trust Company,* 157 U. S. 429, 575, the court said: ''It is the decision in the case of the Thomas Jefferson which mainly embarrasses the court in the present inquiry. We are sensible of the great weight to which it is entitled. But at the same time we are convinced that, if we follow it, we follow an erroneous decision into which the court fell, when the great importance of the question as it now presents itself could not be foreseen; and the subject did not therefore receive that deliberate consideration which, at this time, would have been given to it by the eminent men who presided here when that case was decided. For the decision was made in 1825, when the commerce on the rivers of the West and on the lakes was in its infancy, and of little importance, and but little regarded compared with that of the present day. However, the nature of the question concerning the extent of the admiralty jurisdiction, which have arisen in this court, were not

calculated to call its attention particularly to the one we are now considering.

"Manifestly, as this court is clothed with the power, and intrusted with the duty, to maintain the fundamental law of the Constitution, the discharge of that duty requires it not to extend any decision upon a constitutional question if it is convinced that error in principle might supervene."

This special court is profoundly impressed with the suggestion that it should not, without the most careful consideration, overrule any decision of the able and learned regular court. And so, with the valuable aid of such members of the bar of the State as have accepted our invitation to brief and argue this case, we have striven to get all the light possible that we might reach a correct conclusion. We would not overrule the regular court in the case of *Hildreth* v. *Taylor* if we did not feel that it had announced an erroneous and dangerous construction of our Constitution. Such mistakes should never be perpetuated. That there should be no further delay in fixing the correct constitutional rule for determining the majority necessary to adopt an amendment, is shown by the conditions with which the State is confronted, and which no doubt caused the General Assembly to propose, and the people to adopt, the three amendments involved in this case. And we deem it not improper to briefly refer to these conditions. The Judges of the Supreme Court are overworked and underpaid. The docket of that court is eight months behind. Relief is offered by Amendment No. 10.

The credit, honor, prosperity and growth of the counties, cities and towns that are in debt, and the saving from debt of those that are not so involved, depend largely upon Amendment No. 11. The limit of sixty days for each General Assembly, so far as the regular session is concerned, and the want of a limit upon local legislation, have practically made it impossible to get the benefit of the judgment of the members of the

General Assembly upon public questions. This situation can be changed by Amendment No. 12.

Shall the indefensible rule in the case of *Hildreth* v. *Taylor* continue these deplorable conditions?

So, in view of the authorities we have cited, and these conditions, it appears that the court should now depart from the propriety of the doctrine of *stare decisis.* And attention to 7 R. C. L., at page 1008, where there is an excellent sum-up of the holdings of the courts on the question, is called:

"If judges were all able, conscientious and infallible; if judicial decisions were never made except upon mature deliberation, and always based upon a perfect view of the legal principles relevant to the question in hand, and if changing circumstances and conditions did not so often render necessary the abandonment of legal principles which were quite unexceptionable when enunciated, the maxim *stare decisis* would admit of few exceptions. But the strong respect for precedent which is ingrained in our legal system is a reasonable respect which balks at the perpetuation of error, and it is the manifest policy of our courts to hold the doctrine of *stare decisis* subordinate to legal reason and justice, and to depart therefrom when such departure is necessary to avoid the perpetuation of pernicious error. A departure from the rules of *stare decisis* can be justified only upon substantial grounds, and neither justice nor wisdom requires a court to go from one doubtful rule to another. Nor is it a sufficient reason for overturning a rule of law, well settled and apparently salutary in operation, merely because the reason given for its original adoption are not altogether satisfactory, and strict logical reasoning might have led the court originally to have adopted a different rule. If, however, a decision or series of decisions are clearly incorrect, either through a mistaken conception of the law, or through a misapplication of the law to the facts, and no injurious results would follow from their overthrow, and especially if they were injurious or unjust in their opera-

tion, it is the duty of the court to overrule such cases. Hasty or crude decisions should be examined without fear and reversed without reluctance. While it is true that long acquiescence in an erroneous decision, so that it has become a rule of property or practice, may raise it to the dignity of law, yet it must not be understood that a previous line of decisions affecting even property rights can in no case be overthrown. Where the error of a previous decision is recognized, but the rules therein announced have become rules of property, the question whether or not the rule of *stare decisis* should be adhered to becomes a simple choice between relative evils. The rule should be adhered to unless it appears that the evil resulting from the principle established must be productive of greater mischief to the community than can possibly ensue from disregarding the previous adjudications upon the subject. In questions of practice, a close adherence by a court to its own decisions, even though it may at times have erred or decided differently from settled adjudications upon the subject, is necessary and proper for the regularity and uniformity of practice, and that litigants may know with certainty the rules by which they must be governed in the conducting of their cases. In such cases, the importance of the rule generally depends upon the certainty, and not upon the intrinsic merit. But where the decision goes to the merit of the controversy, where the whole right of parties is dependent upon and is governed by it, in such case, if the court should, from any cause, have erred, it is not only proper, but it is an obligatory duty upon them, a duty imperiously demanded by litigants whose rights are before them for adjudication, to reexamine the opinion so pronounced, and, if found to be erroneous, to recede from it. In the matter of constitutional provisions it has been held that, while courts recognize to the fullest extent the necessity for the stability, consistency, and a firm adherence to the doctrine of *stare decisis* in passing upon and construing any provisions of the organic law, yet if an error has been committed, and

becomes plain and palpable, they will not decline to correct it, even though it may have been reasserted and acquiesced in for many years.''

When used in relation to the submission of a question to an election under our republican system of government, the words used should be given their legal significance, rather than the ordinary and actual significance.

The Supreme Court of this State, in *State* v. *Smith*, 40 Ark. 432, said: ''It is the duty of every court, when satisfied of the intention of the Legislature, clearly expressed in a constitutional enactment, to give effect to that intention and not to defeat it by adhering too rigidly to the mere letter of the statute or to technical rules of construction. And any construction should be disregarded that would lead to absurd consequences.''

The following statement of the rule is taken from Lewis' Sutherland's Statutory Construction, vol. II: ''A statute may be construed contrary to its literal meaning when a literal construction would result in an absurdity or inconsistency, and the words are susceptible to another construction, which would carry out the manifest intention.''

Finally, this court holds that this question is set completely at rest by the provisions of the amendment proposed as number thirteen, and adopted in the year 1920 as a substitute for Amendment Number Seven, presumably to remove all doubt about the meaning of Amendment Number Seven, and, in language about which there can be no doubt, the vote on the question is made the test of measures proposed by the General Assembly, as well as those initiated by the people. Thirteen was adopted by a very large majority of those voting on the amendment.

Here are some of the provisions of this substituted amendment: ''The legislative power of the people of this State shall be vested in a General Assembly, which shall consist of the Senate and House of Representatives, but the people reserve to themselves the power to pro-

pose legislative measures, laws and amendments to the Constitution, and to enact or reject the same at the polls independent of the General Assembly.''

"Definition: The word 'measure' as used herein includes any bill, law, resolution, ordinance, charter, constitutional amendment or legislative proposal or enactment of any character."

"Majority: Any measure submitted to the people *as herein provided* shall take effect and become a law when approved by a majority of the votes cast upon such measure, and not otherwise, and shall not be required to receive a majority of the electors voting at such election."

"This section should not be construed to deprive any member of the General Assembly of the right to introduce any measure, but no measure shall be submitted to the people by the General Assembly, except a proposed constitutional amendment or amendments as provided in this Constitution."

It is insisted that, under Amendment Number Seven, only a majority of the votes cast upon any initiated amendment is necessary to adopt, but that, to adopt an amendment proposed and submitted by the General Assembly, there must be a majority of all the electors voting at such election. For the settlement of this case it is not necessary for us to decide that question. The amendment voted upon in 1920 as number thirteen was by initiated petition, and received the votes necessary to adopt it. Thirteen and not seven, should govern the majority that would decide whether or not the Amendments ten, eleven and twelve were adopted. Thirteen requires only a majority of the votes cast upon the amendment. Each of the three amendments received such a majority, and was adopted.

The court is of the opinion that the submission of an amendment in 1922 substantially like that of number thirteen, and which received less than a majority of the votes cast upon it, did not have the effect of repealing thirteen, and that it remains a part of the Constitution

just as if there had been no submission and vote on a similar amendment in 1922.

It is insisted that the words *"as herein provided"* in the third paragraph quoted from the amendment proposed as thirteen, have the effect to limit the requirements for adoption therein prescribed, which is "a majority of the votes cast upon such measure," to amendments initiated by the people, and that thirteen does not apply to amendments proposed and submitted by the General Assembly.

This is contrary to reason and practice in legislation and not supported by the authorities.

If such had been the intention, instead of the words used, the words "this section" or "this article" would have been substituted.

The Amendment Number Thirteen must be construed as though introduced into the place of § 22, article 19, of the original Constitution, and the legal significance of the words *"as herein provided"* is as if the words *"as provided by the Constitution"* were substituted for them.

In the case of *McKibbon* v. *Lester,* 9 Ohio State 627, the court said, "the words *'under the restrictions and limitations herein provided'* must be taken to refer to the restrictions and limitations provided in the original act, as it stands after all the amendments made thereto are introduced into their proper places therein."

The decree of the chancellor enjoining the appellant, the mayor of Little Rock, from issuing bonds under the Amendment No. 11 is reversed and the case dismissed.

ARNOLD, Special Justice, (concurring).   The Judges of the Supreme Court having certified to the Governor their disqualification to determine whether or not two certain proposed amendments to the Constitution of Arkansas, submitted by the joint and concurrent resolutions of both houses of the Legislature to the biennial election of 1924, were adopted, this court was appointed by the Governor, under authority of § 9, art. 7, of the

Constitution, to determine the two causes involving the proposed amendments, one of them coming by appeal from the circuit court and the other from the chancery court of Pulaski County.

One of the amendments, styled "Proposed Amendment No. 10," authorizes the Legislature to provide for two additional judges of the Supreme Court and fixes the salaries of the judges, until otherwise provided by law, at $7,500 per annum.

The other amendment, submitted as No. 11, authorizes counties, cities and incorporated towns to issue interest-bearing certificates of indebtedness, or bonds with interest coupons, to secure funds to pay outstanding indebtedness existing at the time of the adoption of the said amendment, and provides that no county, city or incorporated town shall make any allowance for any purpose whatsoever in excess of the revenue from all sources for the fiscal year in which said contract or allowance is made, nor issue any scrip or warrants in excess of the revenue for the current fiscal year, and makes a violation thereof a misdemeanor.

The regular court, in certifying its disqualification to try these cases, follows its decision in *Ferrell* v. *Keel*, 103 Ark. 96. Also see the decision of the special court appointed by the Governor involving the construction of a portion of Amendment No. 10, as it is called, in *Ferrell* v. *Keel*, 105 Ark. 380, but the digester of statutes has designated said amendment as No. 7.

At the biennial election of 1924, proposed Amendment No. 10 received 52,151 votes as against 40,955; the proposed Amendment No. 11 received 57,854 votes, while 35,449 were cast against it. If the decision of these cases should rest upon the question whether the two proposed amendments received a majority of the votes upon the question, then they have been adopted and are a part of the Constitution of this State; but, if their adoption depends upon whether or not a majority of the electors voting at such election voted in favor of them, then they have not been adopted.

Beginning with the vote on the Fishback Amendment, which was the first amendment to the Constitution, there was a difference of opinion as to the meaning of § 22, art. 19, in which the following language is used: "And if a majority of the electors voting at such election adopt such amendment, the same shall become a part of this Constitution; but no more than three amendments shall be proposed or submitted at the same time." The first record of a decision on this question is in *Knight* v. *Shelton,* 134 Fed. 223 (decided in 1905), holding that, before an amendment could be adopted, it was necessary that a majority of the electors voting at the election should vote in favor of the amendment. The next case was that of *Rice* v. *Palmer,* 78 Ark. 432, with Justices HILL, BATTLE and WOOD delivering the majority opinion, holding that it required a majority of the electors voting at the election to adopt an amendment to the Constitution. There were able dissenting opinions in this case, rendered by two of our great judges, McCULLOCH and RIDDICK. Both sides of the proposition were ably argued, and *Vance* v. *Austell,* 45 Ark. 400, was relied upon as sustaining the proposition that it required only a majority vote upon the question. The decision in *Rice* v. *Palmer,* holding that a majority voting at the election was necessary to adopt an amendment, was quickly followed by *St. L. S. W. Ry. Co.* v. *Kavanaugh,* 78 Ark. 468, in which the whole court joined in sustaining the majority opinion in the Rice-Palmer case.

In the consideration of these cases resort was had to the decisions of other States, and authorities were found on both sides of the question, and, since those decisions were rendered, there have been decisions of other States for and against the majority rule being confined to those voting upon the question. These decisions are referred to in the able briefs filed by counsel for both the appellants and the appellees in the present case, and it is deemed unnecessary to repeat the arguments advanced therein, as the question was settled by the two decisions thereon and remained settled until

the adoption of the Initiative and Referendum at the biennial election of 1910 and designated as Amendment No. 7, as it appears in Crawford & Moses' Digest of the Statutes (1921), but which is referred to as Amendment No. 10 in the case of *Hildreth* v. *Taylor*, 117 Ark. 465. We are called upon now to determine whether Amendment Number Seven changed that part of the Constitution of 1874 laid down in § 22, article 19, which provides "And if a majority of the electors voting at such election adopt such amendments the same shall become a part of the Constitution." Does that part of Amendment Number Seven of the Constitution which reads: "Any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon and not otherwise," apply to the adoption of amendments to the Constitution and supersede said § 22 of article 19 of the Constitution. The decision of the question involves reconsideration of the opinion in the case of *Hildreth* v. *Taylor, supra.* It was held in that case that the words "any measure" pertained only to legislative acts referred to the people under the referendum, and that it did not apply to constitutional amendments and laws initiated by the people. It is also implied in the decision that constitutional amendments submitted by the Legislature were still farther removed from the operation of Amendment No. 7, and that such amendments proposed by the Legislature did not come within the meaning of the language, "measure referred to the people."

We will therefore first determine whether the Initiative and Referendum Amendment No. 7 includes proposed amendments to the Constitution initiated by the people depending for their adoption on the majority of votes case thereon and not upon § 22, article 19, upon a majority voting at the election. This consideration involves proposed amendment No. 13, which was initiated by the people under the powers of the original I. & R. No. 7 and voted upon in 1920. This measure (No. 13), under its comprehensive and enlarged provisions, so

regulated the initiative and referendum principle as to remove the doubts which had arisen in judicial construction of the I. & R. Amendment No. 7, and it was intended to be in substitution of Amendment No. 7. Therefore, if it was adopted at said election of 1920, it fixed a standard, the majority voting on the question, for determining whether the two amendments which had been proposed by the Legislature, No. 10 and No. 11, and voted upon in 1924, had been adopted. In other words, if Amendment No. 13 became part of the Constitution in 1920, under the Initiative, it follows that No. 10 and No. 11, by the same rule which was carried forward from the original I. & R. Amendment No. 7 into No. 13, which was a majority voting upon the question, were adopted, and under proposed Amendment No. 13, the same rule is fixed for proposed amendments, a majority voting on the question, whether the amendment is proposed by the Legislature or initiated by the people.

Amendment No. 13 received 86,360 votes, and there were 43,662 votes cast against it. Without regard to whether the Speaker of the House declared its adoption, the court must take judicial knowledge of the vote upon the amendment and decide whether it became a law. *Grant* v. *Hardage,* 106 Ark. 506.

This brings us now to an analysis of said Amendment No. 7, and to determine whether Amendment No. 13, voted on at the election in 1920, became a law. Said amendment No. 7 reads as follows:

"Section 1. The legislative powers of this State shall be vested in a General Assembly, which shall consist of the Senate and House of Representatives, but the people of each municipality, each county and of the State, reserve to themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls as independent of the legislative assembly, and also reserve power, at their own option, to approve or reject at the polls any act of the legislative assembly. The first power reserved by the people is the initiative, and not more than 8 per cent. of the

legal voters shall be required to propose any measure by such petition, and every such petition shall include the full text of the measure so proposed. Initiative petitions shall be filed with the Secretary of State not less than four months before the election at which they are to be voted upon.

"The second power is a referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety), either by the petition signed by 5 per cent. of the legal voters or by the legislative assembly as other bills are enacted. Referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. The veto power of the Governor shall not extend to measures referred to the people. All elections on measures referred to the people of the State shall be had at the biennial regular general elections, except when the legislative assembly shall order a special election. Any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise. The style of all bills shall be, 'Be it Enacted by the People of the State of Arkansas.' This section shall not be construed to deprive any member of the legislative assembly of the right to introduce any measure. The whole number of votes cast for the office of Governor at the regular election last preceding the filing of any petition for the initiative or for the referendum shall be the basis on which the number of legal votes necessary to sign such petition shall be counted. Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State, and, in submitting the same to the people, he and all other officers shall be guided by the general laws and the acts submitting this amendment, until legislation shall be specially provided therefor."

What is the meaning of the following language appearing in the second paragraph of the foregoing

Amendment No. 7: "Any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise?" The opinion in *Hildreth* v. *Taylor, supra,* holds that the words "any measure" refer only to legislative acts, and that they do not change the law (§ 22, art. 19, of the Constitution) with reference to the adoption of amendments to the Constitution as interpreted in *Rice* v. *Palmer, supra.*

It will be seen, in the first paragraph of Amendment No. 7, that the people reserve to themselves the power to propose laws and amendments to the Constitution, and the same are referred to as "any measure." In the next sentence it is said: "The first power reserved by the people is the initiative, and not more than 8 per cent. of the legal votes shall be required to propose any *measure* by petition. Then the amendment takes up the referendum in the statement, "and also reserve power, at their own option, to approve or reject at the polls any act of the legislative assembly." The amendment then proceeds to say that the first power reserved by the people is the initiative, and that not more than 8 per cent. of the legal voters shall be required to propose any *measure* by such petition, and that every such petition shall include the full text of the *measure* so proposed. Initiated petitions, it is stipulated, shall be filed with the Secretary of State not less than four months before the election at which they are to be voted upon. The next paragraph takes up the referendum again, stating that it may be ordered either by petition signed by 5 per cent. of the legal voters, or by the legislative assembly as other bills are enacted, and that referendum petitions shall be filed with the Secretary of State not more than 90 days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. Then follows a provision that the veto power of the Governor shall not extend to measures referred to the people. It is then provided that all elections on

measures referred to the people shall be had at the biennial regular general election, except when the legislative assembly shall order a special election. This is followed by the language specially under consideration: "Any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise." Following this is a provision with reference to the initiative: "The style of all bills shall be, 'Be it Enacted by the People of the State of Arkansas;'" also, "This section shall not be construed to deprive any member of the legislative assembly of the right to introduce any *measure."* It is then provided that the whole number of votes cast for the office of Governor at the regular election last preceding the filing of any petition for the *initiative* or for *referendum* shall be the basis on which the number of legal votes necessary to sign such petition shall be counted, and that the petition and orders for the initiative and for the referendum shall be filed with the Secretary of State.

The analysis of these two paragraphs, constituting Amendment No. 7, shows that the initiative as well as the referendum are both provided for in the first paragraph. It is also shown that the second paragraph refers alternately to the initiative and to the referendum. It cannot therefore be said that the first paragraph is devoted solely to the initiative nor that the second paragraph is devoted solely to the referendum. The law governing each must be found, not in one of these paragraphs, but in the consideration of both. The learned judge, in delivering the opinion in *Hildreth* v. *Taylor,* started out with the proposition: "One of the convincing things which leads to that conclusion (that the majority vote prescribed by the amendment did not apply to constitutional amendments) is that the language of the amendment was in substance, nay, almost literally, borrowed from a constitutional amendment adopted by the people of another State, Oregon, 1902, and that there is a presumption that the construction of it in

that State was also borrowed." The opinion then proceeds to say that the people, in 1906, in Oregon amended the initiative and referendum law providing that a proposed amendment to the Constitution initiated by the people could be adopted by a majority of those voting on the question. We do not think that the fact that the people of Oregon adopted an amendment to supplement and make plain the meaning of the first draft of the initiative and referendum should receive the interpretation of the court that is given in this case. We recognize that, where there are judicial decisions interpreting a statute which we adopt, we take the statute with its construction as fixed by those decisions, but what some people may have thought necessary to do in resubmitting an amendment, we do not think is binding upon the courts of Arkansas in the interpretation of the plain provision of Amendment No. 7, which says that any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon.

We have been referred to the case of *Farrell* v. *Port of Columbia,* 50 Ore. 169, 93 Pac. 254 (decided in 1908), which seems to have an important bearing, showing that the majority rule was created in the I. and R. Amendment of 1902, from which we quote as follows:

"It is insisted, however, for the first time, that the amendment of § 2, art. 11, of the Constitution, adopted in June, 1906, prohibiting the Legislature from creating corporations by special laws, was not legally adopted, because it was not twice submitted to and approved by the people. By § 1, art. 4, as amended in 1902, the people reserve to themselves the power to propose amendments to the Constitution and enact or reject them at the polls, independent of the legislative assembly. This section provides that, upon a petition of not more than 8 per cent. of the legal voters of the State, proposing any measure, being filed with the Secretary of State not less than four months before the election at which

such measure is to be voted upon, the same shall be submitted to the people, and, if approved by the majority of the votes cast thereon, shall become operative."

It is stated in *Hildreth* v. *Taylor*: "It is earnestly insisted that this view of the matter (the language under discussion with reference to the majority required) leaves Amendment No. 10 (7) without any specification at all as to the number of votes necessary to enact or adopt an initiated bill. That is true, but it does not follow that that feature of the amendment would, in the absence of enabling legislation, fail because there is not such specification. This is a government of majorities, or, rather, of plurality of the votes cast on any given question, unless there is some contrary specification in the organic law; and, when the framers of the amendment provided for the exercise of the initiative and the submission of laws to the people through that agency, they necessarily meant that the majority of those voting on any particular question should control. That, however, does not apply to the adoption of amendments to the Constitution, for the obvious reason that the Constitution itself provides another rule, and the framers of this amendment are presumed to have omitted any other provisions in recognition of the force of that provision."

The majority of the special court fails to see soundness in that argument, since such an interpretation simply means that the I. and R. Amendment contains a useless sentence, viz: "Any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise." By that interpretation it was useless to prescribe that a majority should be required on legislative acts referred to the people, since this is a country of majorities. On the other hand, it is the opinion of the majority of the special court that the sentence quoted includes constitutional amendments and laws initiated by the people. It has been held that Amendment No. 7 is complete within itself in that it is self-executing. *Arkansas Tax Commission* v. *Moore*, 103 Ark. 48.

There is another statement in the opinion in *Hildreth v. Taylor* which is worthy of consideration:

"It would therefore be doing violence to the design of the framers of the amendment to attribute to them an intention to require a less number of votes to adopt an amendment proposed by the people through the power of the initiative than one submitted by the General Assembly."

This assumes that the Initiative and Referendum did not change § 22 of art. 19, of the Constitution of 1874, which requires a majority of all votes cast at an election before an amendment is adopted. If it is true that said section of the Constitution is in effect, then there remain two criterions for determining whether an amendment has been adopted or not—one applying to amendments that are proposed by the Legislature and governed by § 22, art. 19, and the other applying to amendments initiated. And, if it be true that the people did not intend to have two rules governing the decisions on amendments, then the old rule would have to give way to the new.

The majority have reached the conclusion that the initiated Amendment No. 13 was adopted in 1920 by reason of the existence of that provision of Amendment No. 10 (No. 7) which we have under discussion, providing that any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise. We have further concluded that Amendments Nos. 10 and 11, now under consideration, became a part of the Constitution by reason of the fact that a majority of the qualified voters voting upon the question of their adoption voted in favor of the same, being controlled by certain provisions of Amendment No. 13 (Acts 1919, p. 484), under the head of "general provisions," from which we quote:

"Definition. The word 'measure' as used herein includes any bill, law, resolution, ordinance, charter, constitutional amendment or legislative proposal or enactment of any kind."

This language sets at rest the controversy, or rather the difference of opinion, which had theretofore existed as to whether or not amendments to the Constitution offered by the Legislature were embraced within the term "measure submitted to the people," and therefore the language above quoted embraces Amendments Nos. 10 and 11.

We quote further from said Amendment No. 13 (p. 485), as follows:

"Majority. Any measure submitted to the people as herein provided shall take effect and become a law when approved by a majority of the votes cast upon said measure, and not otherwise," and shall not be required to receive a majority of the electors voting at said election. Such measure shall be operative on and after the thirtieth day after the election at which it is approved, unless otherwise specified in the act."

We have been considering this case for a number of days and have had two full days of oral arguments, in which many of the leading lawyers of the State have taken part and filed elaborate briefs for the purpose of giving the court their best efforts in order to reach a correct determination on one of the most important cases which has come before the Supreme Court. We have been impressed with the delicacy and gravity of the situation. This court is overruling a decision of the regular court, and we have reached our conclusion only after a thorough consideration of the conditions and circumstances which sometimes do arise in the course of legal procedure justifying the overruling of a case. We are also alive to the unusual situation of the special court, whose duties will be performed within a short time, taking the responsibility upon itself of establishing a rule different from that supported by a decision of the regular court. When the special justices assumed the obligations resting upon them by virtue of their commissions in these cases, the responsibility then became theirs to act as they believed the regular court would have acted upon full reconsider-

ation of the *Hildreth* v. *Taylor, supra,* case, and, being charged with this duty and responsibility, the special court is under obligation to exercise independent thought and judgment, with full power to do what justice requires in the grave issues here involved.

In our effort to interpret the meaning of the amendments which have been discussed we have endeavored to follow well-known rules and canons of construction. No better rule can be found, we think, than that followed by the special Supreme Court in *Ferrell* v. *Keel,* 105 Ark. 384, in which the court said:

"The correct decision of the case involves nothing but the application of rules of law that must govern the court in the construction of the amendment. By what rules of law should we be governed? More than sixty years ago, in the case of *State* v. *Scott,* 9 Ark. 270, Mr. Justice Walker, in a case involving the construction of an amendment to the Constitution, said: 'In determining the intention of the framers of the amendment, we must keep in view the Constitution as it stood at the time the amendment was made, the evil to be remedied by the amendment, and the amendment proposed, by which the evil is to be remedied. No interpretation should be allowed which would conflict with any other provision of the Constitution, or which is not absolutely necessary in order to give effect to the proposed amendment. On the contrary, such construction should be given as will, if possible, leave all the other provisions in the Constitution unimpaired and in full force."

In the case of the *State* v. *Donaghey,* 106 Ark. 61, Mr. Justice Kirby, speaking for the court, said:

"The people are the source of all political power, and it has never been doubted that, according to the institutions of this country, the sovereignty of every State resides in the people of the State, and they can alter or change their form of government at their own pleasure. Whether they have done so, is a question to be settled by the political power, and, when that power

has decided, the judiciary can but follow and sustain its action.''

I am authorized to say Mr. Special Justice CRAVENS approves this opinion.

DISSENTING OPINION.

COLEMAN, Special J. The Constitution is the organic law of the State, and it embodies the fundamental principles according to which the sovereign power of the people is to be exercised through the governmental agencies created by them for that purpose. Its framers expected it to endure, and they knew that it would apply to unforeseen and ever-changing conditions. For this reason they drafted its provisions on broad and general lines, leaving its particular application to be worked out through the processes of construction and interpretation. It therefore contained the germ of growth, but the growth was merely to be an unfolding of the intention and purpose in the mind of the people when they framed the Constitution, as expressed in its terms. Though subject to construction, the Constitution itself was to undergo no change. It was not to be one thing today, and quite a different thing tomorrow. There was no place in its organic character for variableness, and it was contemplated that there would be an unbroken continuity of its original meaning and mandate throughout its entire existence.

In expounding the Constitution, the court acts under the same weight of responsibility that rested on its framers. It acts under a duty, not a license. Its sole authority is to discover the intention of the sovereign power behind the instrument, as disclosed and exemplified in its language and provisions. It is merely the mouthpiece through which that power speaks. And, when it thus speaks, it is the old voice of the Constitution, expressing its original meaning and its pristine purpose.

It is just as important, just as imperative, that there should be consistency, certainty and stability in the interpretation of the Constitution as in its original

framework. · The Constitution is unavoidably subject to interpretation and construction, for it is only through those processes that it can attain its final expression. But the very genius of the Constitution, as the fundamental fabric of the whole governmental institution, would be impaired, if not destroyed, if it were construed to be one thing at a given period, and something else at another. It must have an enduring meaning, as well as an enduring existence, if it is to accomplish its function as the fundamental law, and mark at all times, with procrustean exactness, those limitations and restrictions which the people, in their sovereign capacity, conceived to be necessary for the protection of their political rights, and for the promotion and advancement of those blessings to secure which the government itself was created.

When the court places a certain construction on any provision of the Constitution, the construction becomes, in effect, a part of the Constitution itself. It is a judicial determination that the Constitution always has been what the court construes it to be. It fixes the rule by which property rights of the past, as well as those of the present and of the future, must be measured. It draws a line which extends straight back to the adoption of the Constitution, on one side of which all official acts performed by the various departments of State are valid, and on the other side of which they are void. It establishes retrospectively the constitutionality of acts of the Legislature, to which the commercial and social activities of the people have conformed, and under which rights have sprung up and obligations have been incurred. It even determines whether or not amendments to the Constitution itself, previously submitted to and voted on by the people, have been adopted, without regard to the fact that they have been officially declared, under previous constructions of the Constitution, not to have carried, and such official declaration has been long acquiesced in. It is this character, and this all-comprehensive effect of judicial constructions,

especially of the Constitution, that should attach to them the qualities of endurance and stability.

Any construction of the Constitution is liable to be questioned, particularly after a lapse of years and a change in conditions. But this very possibility occasions the necessity for, and emphasizes the wisdom of, the principle of stability. Business may be safe, and property secure, under an erroneous construction, if there is a well-founded conviction that it will not be departed from except for extraordinary and overwhelming reasons—reasons far more impelling than the mere fact that the court, at a subsequent time, might feel inclined to hold differently if the question were one of first impression. But there could be neither safety nor security under a judicial practice and sanction of factitious change. Granted that it is a choice between two evils—between error that charts the sea, and uncertainty that destroys all reckonings—it is a choice without alternatives; for the public can adjust itself to the one, it cannot guard against the other. And in the one case, it is always possible to correct the error, if needs be, by amending the Constitution, which could be accomplished without affecting the status of things, or doing the least violence to existing rights. In the other, there is neither remedy for the evil nor protection against its results.

Section 22 of article 19 of the Constitution of 1874 provides that either branch of the General Assembly may propose amendments to the Constitution, to be submitted to the electors of the State for approval or rejection, and that, "if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this Constitution."

In *Rice* v. *Palmer*, 78 Ark. 432, the court, construing this section, said: "The majority necessary to adopt it must be the majority of electors voting at the general election for Senators and Representatives, and not a mere majority voting on the subject of the amendment. The framers of the Constitution of 1874 used plain and simple English. They knew what they wanted, and what

they did not want, and this, more than any other Constitution of the State, is full of details and explicit limitations. The time in which it was framed begot positiveness and strong convictions."

The appellants have marshaled their forces against *Rice* v. *Palmer,* and the attack is made with great earnestness and vigor. The court is asked to review and overrule that case, and change the construction which it places on § 22 of article 19 of the Constitution.

The assault is met at the threshhold with the clear, direct and explicit language of the section. "If a majority of the electors voting at such election adopt such amendments, the same shall become a part of this Constitution."

Back of this language, crystalline in its lucidity, was a history that penned it, and that selected each word with the most discriminating care. The Constitutions of 1836, 1861 and 1864 provided that amendments could be made by the General Assembly, by a vote of two-thirds of the members of each house. They contained no provision for submitting amendments to the people. By the Constitution of 1868, however, the people took from the General Assembly the power to amend the Constitution, but authorized it to propose and submit amendments, and reserved to themselves the power to approve and ratify. This was the first reservation of power in this State, and the provision was, "if the people shall approve or ratify such amendment or amendments, by a majority of the electors qualified to vote for the members of the General Assembly voting thereon, such amendment or amendments shall become a part of this Constitution."

This language also was clear and unmistakable. In the first experiment of reserving power it was specifically provided that the favorable vote of a majority of the qualified electors voting on the amendment was all that was required for its adoption. But when the people came to write the Constitution in 1874, they did not copy the provision of the Constitution of 1868. On

the contrary, they made a radical change in its terms. The change was not made haphazardly or by chance, for nothing was left to chance in that convention. They wrought out of their own experience; and they had the experience of other commonwealths, and the models of their Constitutions, as a guide. They knew that the Constitutions of just four States in the Union, Illinois, Ohio, Mississippi and Nebraska, required a majority of the votes cast at the election for their amendment, while the Constitutions of most of the other States contained provisions similar to that of the Constitution of 1868. A deliberate and intentional change therefore from "voting thereon" to "voting at such election," must have been purposeful. *Harris* v. *Walker*, 74 So. (Ala.) 40. And the conclusion is irresistible that the framers of the Constitution of 1874 intended the words, "a majority of the electors voting at such election," to mean exactly what they say. They certainly did not intend them to have the same meaning as the words "voting thereon" which they had purposely rejected. *Knight* v. *Shelton*, 134 Fed. 423.

Thirty-one years elapsed before any question was raised as to the number of votes required under the provision of the Constitution of 1874. The question was first presented in *Knight* v. *Shelton, supra,* which was decided by the Federal court at Little Rock in 1905. In that case the court made an exhaustive research of the authorities, and a painstaking comparison of the Constitutions of the various States, all of which are reviewed in the opinion. And the court construed § 22 of article 19 to require a majority of all the votes cast at the election for the adoption of an amendment. The case of *Rice* v. *Palmer* followed a year later, and this court, in that case, after a like careful consideration, reached the same conclusion.

The decision has remained unchanged and unshaken from that day to this. It has been affirmed and reaffirmed in every case that has arisen. *Railway Co.* v. *Kavanaugh,* 78 Ark. 468; *Cobb* v. *Hammock,* 82 Ark.

584; *State* v. *Donaghey,* 106 Ark. 161; *Grant* v. *Hardage,* 106 Ark. 508; *Hildreth* v. *Taylor,* 117 Ark. 465. It was said by the court in one case, referring to *Rice* v. *Palmer,* that "whatever doubts upon that question which may have existed theretofore were finally put at rest by that decision, and it must now be treated as the settled law of this State." *Cobb* v. *Hammock,* 82 Ark. 584. The decision has been cited with approval and followed by the courts of other States. *Ellingham* v. *Dye,* 99 N. E. (Ind.) 1; *In re McConaughey,* 119 N. W. (Minn.) 408; *State* v. *Marcus,* 152 N. W. (Wis.) 419. And the courts of other States have put the same construction on similar provisions in their own Constitutions. *State* v. *Powell,* 77 Miss. 543; *Kelly* v. *State,* 95 So. (Miss.) 690; *Simmons* v. *Bud,* 136 N. E. (Ind.) 14; *In re Boswell,* 100 N. E. (Ind.) 833; *People* v. *Stephenson,* 117 N. E. (Ill.) 747; *In re Initiative Petition,* 109 Pac. (Okla.) 823; *Carton* v. *Secretary of State,* 45 N. W. (Mich.) 429; *State* v. *Brooks,* 99 Pac. (Wyo.) 847.

Since the adoption of the Constitution thirty-nine amendments have been proposed and submitted. Of this number, nine received a majority of the votes cast at the election and were officially declared to be adopted, and now appear as a part of the Constitution in Crawford & Moses' Digest. Four amendments which received a majority of the votes thereon, but not a majority of the votes cast at the election, were nevertheless declared to be adopted by the Speaker of the House of Representatives. Two of them were tested in the courts. It was held that the question whether or not they had been adopted was a judicial question, and, further, that they had not been adopted. The remainder of the thirty-nine amendments proposed and submitted failed to receive a majority of the votes cast at the election, and were officially declared by the Speaker of the House not to have been adopted. Proclamations of the Governor were issued in accordance with the declarations of the Speaker of the House.

It thus appears that all three of the great departments of State have approved, acquiesced in and followed the construction of the Constitution announced in *Rice v. Palmer*. It has also been acquiesced in by the people themselves, for the fate of the thirty-nine efforts to amend the Constitution has been determined by its mandate, and they have accepted its arbitrament, and abided by its results. And it is significant that neither the General Assembly nor the people have ever proposed an amendment to change the requirement as to the number of votes necessary for the adoption of amendments, unless it could be said to be embodied in the proposals for the initiative and referendum.

For these very cogent reasons, a majority of the judges decline to overrule the case of *Rice v. Palmer*.

On January 12, 1911, the people adopted Amendment No. 7, known as the Initiative and Referendum Amendment; and it is contended that this amendment repeals by implication that part of § 22 of article 19 which specifies the number of votes required to adopt an amendment. Amendment No. 7 is as follows:

"The legislative powers of this State shall be vested in a General Assembly, which shall consist of the Senate and House of Representatives, but the people of each municipality, each county and of the State reserve to themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls as independent of the legislative assembly, and also reserve power, at their own option, to approve or reject at the polls any act of the legislative assembly. The first power reserved by the people is the initiative, and not more than 8 per cent. of the legal voters shall be required to propose any measure by such petition, and every such petition shall include the full text of the measure so proposed. Initiative petitions shall be filed with the Secretary of State not less than four months before the election at which they are to be voted upon. ·

"The second power is the referendum, and it may be ordered (except as to laws necessary for the imme-

diate preservation of the public peace, health or safety), either by the petition signed by 5 per cent. of the legal voters or by the legislative assembly as other bills are enacted. Referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. The veto power of the Governor shall not extend to measures referred to the people. All elections on measures referred to the people of the State shall be had at the biennial regular general elections, except when the legislative assembly shall order a special election. Any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise. The style of all bills shall be, 'Be it Enacted by the People of the State of Arkansas.' This section shall not be construed to deprive any member of the legislative assembly of the right to introduce any measure. The whole number of votes cast for the office of Governor at the regular election last preceding the filing of any petition for the initiative or for the referendum shall be the basis on which the number of legal voters necessary to sign such petition shall be counted. Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State, and, in submitting the same to the people, he and all other officers shall be guided by the general laws and the acts submitting this amendment until legislation shall be specially provided therefor.''

Amendment No. 7 grew out of a great political agitation, which stirred the people of the whole State, and in which the most tremendous issues were involved. As soon as it was adopted, a violent controversy arose as to its real scope and effect, and three clear-cut and well defined views, which may be called the ''revolutionary,'' the ''independent plan,'' and the ''supplementary,'' developed, and each was earnestly championed.

According to the first, the amendment was radical and revolutionary, covered the whole field of the reserved

power as to amendments and acts, and regulated every exercise of that power. This view is forcefully exemplified in the dissenting opinion of special Justices HILL and McCOLLUM in *Ferrell* v. *Keel,* 105 Ark. 380, in which it is said: "The amendment prescribes the number of votes necessary to adopt any measure submitted to the people, and provides that the people or the General Assembly may submit amendments to the Constitution, or measures, for adoption or rejection, at general elections, or special elections to be called to vote thereon. The lawmaking power of the State is thereby revolutionized, and all of it is vested, affirmatively or negatively (save alone a limited class of emergency acts) in the people themselves."

According to the second, the "independent plan" view, the amendment created a wholly independent plan for the submission and adoption of amendments, radically different from that provided in § 22 of article 19, and completely regulated the exercise of the reserved power of initiating amendments by the people, but had nothing to do with the submission of amendments by the General Assembly. This view is vigorously presented in the dissenting opinion of Justices WOOD and SMITH in *State ex rel. Little Rock* v. *Donaghey,* 106 Ark. 56, in which it is said: "A comparison of the provisions of § 22 of article 19 of the Constitution and its enabling act with the provisions of Amendment No. 7 and its enabling act, set out above, will discover two radically different and wholly independent plans for the submission and adoption of amendments to the Constitution. The one representative, by the Legislature, the other direct, by the people themselves." And they contended that § 22 of article 19 controlled exclusively amendments submitted by the Legislature, while amendment No. 7 controlled exclusively amendments initiated by the people.

The third, or "supplementary" view, occupied middle ground between these two extremes. According to it, the amendment was not revolutionary in any sense,

and was only intended to add to the reserved power of the people in the matter of amending the Constitution and enacting laws. By the Constitution, the power of proposing and submitting amendments and of enacting laws was vested exclusively in the General Assembly. The people reserved no power to propose amendments, and no legislative power whatever. The sole reservation was of the power to approve or reject amendments proposed by either branch of the General Assembly, and agreed to by a majority of all the members of each house. And the theory was that the people, in framing Amendment No. 7, confined their efforts to the one purpose of enlarging their power in the matter of proposing amendments, and inserted no provision or specification as to the manner of exercising the power. It was not necessary to insert them, because the specifications were already provided by § 22 of article 19. An amendment initiated by the people would at once therefore come under the specification of § 22, which would be controlling in so far as there was nothing in the amendment in irreconcilable conflict therewith.

When Amendment No. 7 came before the court, all three views were pressed on its attention. But the court held that its duty was to interpret the amendment according to the established canons of judicial construction, and that it was not concerned with the partisan views of its advocates and opponents. "We decline to consider them as proper aids to the judicial determination of its meaning. * * * "The people of the State have approved the principle of the initiative and referendum by the adoption of the amendment, and that has ceased to be a political question. It remains only for the court to give it a rational interpretation for the purpose of carrying out the popular will as expressed by the language used in the instrument which the people have voted upon and have adopted." *Hodges* v. *Dawdy*, 104 Ark. 583. Applying the ordinary rules of construction, it was held: "The constitutional amendment whereby the people of the State reserve to themselves the power

to legislate directly by the initiative or referendum does
not abrogate the existing Constitution and laws of the
State except such provisions as are necessarily repug-
nant thereto.'' * * * ''The amendment being the
last expression of the popular will in shaping the organic
law of the State, all provisions of the Constitution which
are necessarily repugnant thereto must, of course, yield,
and all others remain in force. It is simply fitted into
the existing Constitution, the same as any other amend-
ment, displacing only such provisions as are found to
be inconsistent with it. Like any other new enactment,
it is a fresh drop added to the yielding mass of the prior
law, to be mingled by interpretation with it.''

The court, true to its noblest traditions, stood far
above the arena of political strife, and pronounced its
judgment in the calm majesty of the law. It refused to
be swayed from the sound principles which must deter-
mine the construction of constitutions and statutes
alike, if there is to be stability and security in popular
government. And it applied those principles in constru-
ing the amendment, without the slightest regard to how
the result would be looked upon by the political factions
of the day.

Amendment No. 7 was before the court again in
*Ferrell* v. *Keel, supra,* and the question was whether the
enacting clause specified in the amendment applied to
acts passed by the Legislature. The court approached
the question in the same judicial manner. It announced
the canon of construction that has always been followed
in this State, and then applied it. Quoting from *State* v.
*Scott,* 9 Ark. 270, a case which involved the construction
of an amendment to the Constitution, the court said: ''In
determining the intention of the framers of the amend-
ment, we must keep in view the Constitution as it stood
at the time the amendment was made, the evil to be
remedied by the amendment, and the amendment pro-
posed by which the evil is to be remedied. No interpreta-
tion should be allowed which would conflict with any other
provision of the Constitution, or which is not absolutely

necessary in order to give effect to the proposed amend-
ment. On the contrary, such construction should be
given as will, if possible, leave all the other provisions
in the Constitution unimpaired and in full force.'' And
it was held that the provision with reference to the enact-
ing clause in the amendment did not conflict with § 19
of article 5 of the Constitution. ''They are not in con-
flict because one relates to legislation by the General
Assembly and the other relates to legislation by the
people. They could only be repugnant if the initiative
and referendum amendment covered the whole scope of
legislation. This, in our judgment, it did not do. The
amendment not only does not deal with the whole scope
of legislation, but it shows on its face affirmatively that
it is only creating an additional legislative power and
regulating the manner of its exercise. Instead of deal-
ing with the whole scope of legislation, the initiative and
referendum amendment leaves absolutely untouched the
many provisions of the Constitution contained in article
5 that relate to the exercise of legislative power by the
General Assembly.''

Section 22 of article 19 of the Constitution provides
that only three amendments shall be proposed or sub-
mitted at the same time. Amendment No. 7 is silent
as to the number of amendments that may be submitted.
The question in *State ex rel.* v. *Donaghey, supra,* was
whether or not Amendment No. 7 repealed by implication
§ 22 of article 19 in this respect. The court again
recurred to the rules of construction from which it has
never departed. ''No interpretation of an amendment
should be allowed which would conflict with any other
provision of the Constitution, or which is not absolutely
necessary in order to give effect to the amendment. Such
construction should be given as will, if possible, leave
all the other provisions of the Constitution unimpaired
and in full force.'' And it held that there was no
unavoidable conflict, no absolute repugnancy, between the
amendment and the provision of the Constitution, and
that the former, which limited the number of amend-

ments to be submitted at the same time, remained unimpaired and in full force. The decision was by a unanimous court.

The court, in the foregoing cases, was always consistent. It simply applied the recognized and long established rule of construction, and the result in each case was logical and inevitable. By this process it fitted the amendment into the body of the existing Constitution, as a component part thereof, leaving all the provisions of the Constitution which were not in irreconcilable conflict with the amendment in full force and effect.

The next case was *Hildreth* v. *Taylor*, 117 Ark. 465, and it has received the brunt of the attack in the present controversy. In that case the question was whether or not the provision of § 22 of article 19, "if a majority of the electors voting at such election adopt such amendments the same shall become a part of this Constitution," was repealed by the provision of Amendment No. 7, "any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise." In determining this question, the court cast its decision in the same mold which had been used in every case construing not only Amendment No. 7, but every amendment that has ever been brought before it. It examined the amendment to ascertain whether anything in it was in irreconcilable conflict with, or necessarily repugnant to, § 22 of article 19. It found no such conflict or repugnancy. And, in harmony with established principles, and consistent with its prior decisions, it held that the requirement of the Constitution with reference to the number of votes necessary to adopt an amendment applied to all amendments, whether proposed by the General Assembly or initiated by the people. The court said:

"It is contended, however, by learned counsel for appellees, that Amendment No. 10 specified a different rule with reference to amendments initiated by the people, and they base their argument upon the following language found in the amendment: 'Any measure refer-

red to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise.' The contention is that the language just quoted is broad enough to cover measures of every kind, statutes and amendments to the Constitution initiated by the people, as well as referred bills of the General Assembly. It is argued that the word 'referred,' as used in that connection, means all measures submitted to the people in any manner under the provisions of Amendment No. 10. A consideration of the sentence quoted above, when viewed in its connection with other parts of the amendment, does not, we think, bear out that contention. Any argument that can be made in support of the view that that sentence includes anything more than legislative bills referred to the people is erroneously based upon the assumption that the people, by framing and adopting this amendment, intended to tear away all other provisions of the Constitution and substitute this in place. The argument is necessarily based upon the idea that Amendment No. 10 is revolutionary, and that every sentence contained therein must be considered without reference to its relation to the provisions of the unamended Constitution. This, we think, is an entirely erroneous view to take of the amendment and the design of the people in adopting it. We have said in other cases dealing with the provisions of the amendment that it was intended to take its place in the Constitution as other amendments and to be considered with reference thereto, and that it only repealed other provisions which are found to be necessarily repugnant. *Hodges* v. *Dawdy,* 104 Ark. 583; *State ex rel.* v. *Donaghey,* 106 Ark. 56; *Grant* v. *Hardage, supra.*"

The foregoing is the crux of the decision, and was determinative of the case. But the court went further, not so much for the purpose of fortifying its decision, as to show that a critical analysis of the language of Amendment No. 7 would lead to the same result as the one obtained by the application of the fundamental principles of constitutional construction. The court prefaced

the remainder of the opinion with the statement: "But it is by no means necessary to rest the case upon the application of that principle, for the reason there are so many other indications in the amendment, when considered as a whole, which show that the framers did not have it in mind that the words 'measure referred to the people' were to be interpreted as meaning all amendments to the Constitution submitted in any manner." It is noteworthy that every criticism made in the briefs in the present case, as well as in the arguments at the bar of the court, is leveled at the reasoning employed in this part of the opinion. No one has assailed the real principle on which the decision rests. Indeed, it could not be assailed, without a like attack on the principle which controlled in *Hodges* v. *Dawdy, State* v. *Donaghey,* and *Grant* v. *Hardage, supra.* It is remarkable, to say the least, that an assault that was prosecuted with sufficient vigor to carry it all the way back to *Rice* v. *Palmer* should take a circuitous route that left the Dawdy, Donaghey and Hardage cases unscathed.

A corollary of the rule of construction that every provision of the Constitution which is not in irreconcilable conflict with, or unavoidably repugnant to, the provisions of the amendment must be allowed to stand unimpaired, is the subsidiary rule that, when the language of an amendment is susceptible of two interpretations, one in harmony with the provisions of the Constitution, and the other repugnant to such provisions, the interpretation which avoids a conflict and results in harmony should be preferred. It was under this rule that the court in the Hildreth case discussed the meaning of the words "measure referred." The words are undoubtedly susceptible of two interpretations. They occur in the referendum clause of the amendment, in immediate connection with the specifications on that subject. And it was contended that their meaning in ordinary parlance, as well as that derived from the context with which they are associated, indicates their appropriateness to acts passed by the Legislature and referred to the people,

and their inappropriateness to amendments to the Constitution. It was insisted, on the other hand, that the word ''measure'' was used in its collective sense, and that, by relation back, it was intended to have the meaning of the same word as used in the first paragraph, which speaks of amendments as well as laws. The first interpretation harmonized the provision with § 22 of article 19; the second brought it into absolute repugnancy to that section. The court, following the general rule, that is not questioned even in the present case, adopted the interpretation which established harmony and avoided all conflict.

The Hildreth case was decided by a unanimous court. The judges who decided it compose the court to-day, but are disqualified to sit in the present cases. If they could speak, they would decide now as they decided then, for the canon of construction on which the case was based has undergone no change. Moreover, the ruling of the case has been affirmed and followed. *Whittemore v. Terral,* 140 Ark. 493. And the case itself, decided nearly ten years ago, is strengthened, if that be needed, by *stare decisis.* ''It is essential that there should be stability and uniformity in the construction and interpretation of the law. The conduct of the affairs of State, the rights and interests of individuals, the uniformity of the enforcement of the law, and the proper administration of justice, require in these matters that there should be settled rules. It becomes necessary, as a general rule and as a matter of public policy, to uphold the principles which are announced in the decisions of the court of last resort after they have been followed and acted upon. Relying upon these decisions, public policies are formulated, and the property rights of individuals acquired and fixed.'' *Rhea* v. *State,* 104 Ark. 162. And the court had declared that this doctrine is applicable with peculiar force to decisions construing provisions of the Constitution. ''Without it, it would be difficult, if not impossible, to build up and preserve any valuable system of jurisprudence; and especially is this

rule applicable to decisions on constitutional questions, when such decisions may settle the basis of important public interests, or some system of laws, the overthrow of which might vibrate throughout the State, and tend to produce anarchy and confusion." *Ex parte Hunt,* 10 Ark. 289. If the court, speaking through its accustomed judges, declares itself bound by its own decisions, for much greater reasons should the court, composed of judges who wear the ermine only for a day, respect and follow them. A change of decisions with every change of judges would be intolerable. If such a possibility were once admitted, judicial precedents would be written on the sand, and the courts, which are the steadying and cohesive force in popular government, would become the sport of designing interests, the coveted prize for which factions would contend. *Mabardy* v. *McHugh,* 202 Mass. 148; *London Street Tramway Co.* v *London County Council* (1898), A. C. 375.

MANN, Special J., concurs in this dissent.