## FOSTER *v.* GRAVES.

### Opinion delivered June 1, 1925.

1. STATUTES—EXTRAORDINARY SESSION OF LEGISLATURE—SUPPLEMENTAL PROCLAMATION.—Where the Governor, under Const., art. 6, § 19, has issued a proclamation calling for an extraordinary session of the Legislature to convene, he could before the convening of such session, enlarge his original proclamation by a supplemental proclamation, specifying additional subjects for legislation.

2. APPEAL AND ERROR—APPOINTMENT OF STENOGRAPHER—VALIDITY.— Though a special statute providing for the appointment of a stenographer to transcribe the testimony in chancery cases did not go into effect until after the trial of a cause, if it was in effect when the record of the testimony was made up by the stenographer and filed thereunder, the evidence was properly preserved.

3. STATUTES—REMEDIAL ACTS—APPLICATION TO PENDING PROCEEDINGS. —Statutes in regard to remedies in procedure may be construed to apply to pending proceedings, and will be so applied, unless the language of the statute indicates a contrary intention.

4. ACKNOWLEDGMENT—FORGERY—BURDEN OF PROOF.—Where a deed on record purports to have been acknowledged before a notary public, the burden of proving by a preponderance of the evidence that signatures to the deed and the acknowledgment were forged is upon the party attacking the deed.

5.   MINES AND MINERALS—FORGERY OF DEED—EVIDENCE.—In a suit
     to cancel oil and gas royalty deeds for forgery, a finding that
     the deeds were forged *held* against the weight of the evidence.

6.   APPEAL AND ERROR—CONSIDERATION OF AFFIDAVITS.—While the
     Supreme Court in a chancery case can not on rehearing, consider
     affidavits filed before it for the purpose of testing the correctness
     of its decision, or the decision of the trial court, it may consider
     such affidavits for the purpose of determining whether or not a
     new trial should be permitted.

7.   APPEAL AND ERROR—DISCRETION TO REOPEN CHANCERY CASE.—It is
     within the discretion of the Supreme Court whether, on reversal
     of a chancery case, the case should be reopened for a new trial.

Appeal from Union Chancery Court, Second Division; *W. T. Saye,* Special Chancellor; reversed.

*Marsh & Marlin, Pat McNalley* and *Saxon & Davidson,* for appellants.

*George M. Lecroy,* appellant, *pro se.*

*Powell, Smead & Knox,* for appellees.

WOOD, J.   Appellee, Buchanan Graves, is the owner of a tract of land in Union County, containing eighty acres, and he and his wife, Jennie, gave an oil and gas lease on forty acres, reserving a royalty of one-eighth of the production of oil or other minerals.   This action was instituted by appellees Buchanan Graves and his wife, Jennie, against appellant Foster and his grantees to cancel and set aside two deeds purporting to have been executed by appellees to Foster, conveying one-half of the royalty theretofore reserved by appellees in the aforementioned lease executed by them.

One of the deeds sought to be canceled was dated May 10, 1923, and was filed for record on May 23, 1923, and the other deed was dated May 29, 1923, and filed for record on the same date.   The two deeds covered the same property, and the last one was executed, as claimed, to cure a slight defect in the form of the first deed.   Foster conveyed certain portions of the royalty to appellees Ratcliff, Wilson, Hawkins, LeCroy and Ellison, all of whom were joined as defendants in this action.

It is alleged in the complaint that the deeds were both forgeries—that neither of the appellees executed

the deeds or appeared before any officer to acknowledge the same. The answer contained appropriate denials of the allegations of the complaint, and the cause was heard by the court on oral and documentary evidence. The trial resulted in a decree in favor of appellees canceling the deeds as forgeries. The appeal calls merely for a review of the facts to determine whether or not the findings of the chancery court were against the preponderance of the evidence, but counsel for appellees raise the question in the outset that the testimony of witnesses adduced *ore tenus* is not preserved in the record so as to properly bring it before us for review, and that we must therefore indulge the presumption that the decree appealed from was supported by the evidence.

It is conceded that the General Practice Statute in regard to preserving oral testimony in chancery cases (Crawford & Moses' Digest, § 1269) was not complied with, in that there was no order of the court entered designating a stenographer to take down the testimony and transcribe and file the same. *Harmon* v. *Harmon,* 152 Ark. 129; *McGraw* v. *Berry,* 152 Ark. 453; *Sercer* v. *Hamilton,* 155 Ark. 639; *Smith* v. *House,* 163 Ark. 423.

The General Assembly at the extraordinary session which convened September 24, 1923, enacted a statute regulating the practice in the Seventh Chancery District and providing for the appointment of a stenographer with authority to take down, transcribe and file the testimony in chancery cases. This statute was approved by the Governor on October 13, 1923. The decree appealed from in this case was rendered on November 15, 1923, and the evidence was transcribed by the court stenographer appointed in accordance with the terms of this statute and was filed with the clerk of the chancery court on January 15, 1924. The terms of this statute were complied with, but it is contended by counsel for appellees that the statute is invalid for the reason that it was not within the specification of the Governor's original proclamation convening the Legislature in extraordinary session, and that, though embraced within the specifica-

tions of a supplemental proclamation issued by the Governor prior to the convening of the Legislature, the Governor had no authority to supplement his original proclamation by additional specifications of subjects to be dealt with by the Legislature. It is also contended that the emergency clause was not voted by two-thirds of the members of each house on separate roll call, as provided in Amendment No. 13 to the Constitution, recently declared adopted in the case of *Brickhouse* v. *Hill,* 167 Ark. 513, and that the statute had no application for the reason that it did not go into effect until January 10, 1924, which was ninety days after the adjournment of the special session, and has no controlling effect in making the record in this case.

It is conceded that the subject-matter of this statute was not embraced within the original proclamation issued by the Governor on September 8, 1923, calling the extraordinary session of the Legislature to convene on September 24, 1923, but that on September 17, the Governor issued a supplemental proclamation specifying additional subjects for legislation, and that one of those subjects embraced the statute now under consideration.

In the case of *Sims* v. *Weldon,* 165 Ark. 15, we decided that the Governor was without power, after the commencement of an extraordinary session of the Legislature, to specify additional subjects of legislation so as to enlarge the scope of the original proclamation, and the question now presented is whether or not the Governor has the power, before the convening of an extraordinary session, to enlarge his original proclamation calling the session by specifying additional subjects of legislation. In the case of *Sims* v. *Weldon,* we expressly pretermitted the question now before us by saying: "The question whether the Governor may, before the meeting of the session, amend his call, is not presented in the present controversy, and we expressly refrain from passing upon that question, but we do hold that, after the session has begun, pursuant to the call of the executive,

the power of the executive over that particular session has been exhausted.''

Article 6, § 19 of the Constitution provides: ''The Governor may, by proclamation, on extraordinary occasions, convene the General Assembly at the seat of government, or at a different place, if that shall have become, since their last adjournment, dangerous from an enemy or contagious disease; and he shall specify in the proclamation the purpose for which they are convened, and no other business than that set forth therein shall be transacted until the same shall have been disposed of, after which they may, by a vote of two-thirds of all the members elected to both houses, entered upon their journals, remain in session not exceeding fifteen days.''

Article 4 § 12, of the Constitution of Pennsylvania provides: ''He (the Governor) may, on extraordinary occasions, convene the General Assembly, etc.'' Article 3, § 25 of the Constitution of Pennsylvania provides: ''When the General Assembly shall be convened in special session, there shall be no legislation upon subjects other than those designated in the proclamation of the Governor calling such session.'' These provisions of the Pennsylvania Constitution, on the question now under consideration, are similar in substance and legal effect to article 6, § 19 of our own Constitution, *supra*.

In *Pittsburg's Petition*, 217 Pa. 227, one of the objections to the constitutionality of the act under review in that case, was ''that it is not legislation upon a subject designated in the proclamation of the Governor calling the special session.'' Among other things, the court said: ''Whether the General Assembly ought to be called together in extraordinary session is always a matter for the executive alone. How it shall be called, and what notice of the call is to be given, are also for him alone. The Constitution is silent as to these matters, and wisely so, for emergencies may arise, such as riots, insurrections, widespread epidemics, or general calamities of any kind, requiring the instant convening

of the Legislature, and, in the power given to the Governor to call it, no time for the notice is too short, if it can reach the members of the General Assembly; and with telephones and telegraphs the uttermost portions of the commonwealth can at any time be reached between the rising and the setting of the sun. * * * But no form of proclamation is to be followed, and if, after one has been issued, it occurs to the executive that other subjects than those designated in it should be passed upon by the Legislature, he can unquestionably issue another, fixing the same time for the meeting of the General Assembly as was fixed in the first, and designate other subjects for its consideration. This is, perhaps, what ought to be done when other subjects than those designated in the proclamation are to be brought to the attention of the Legislature in special session, and, if it had been done in the present case, the objection of the appellants now under consideration would hardly have been raised. This, however, is not for the judiciary, but for the Governor alone. The proclamation of January 9 is in effect a second proclamation. In it the Governor adopts his original call for the purpose of fixing the time of the meeting of the General Assembly, and then proceeds to designate the additional subjects of legislation. With every presumption in favor of compliance by the executive with the constitutional requirements relating to his calling the General Assembly together in extraordinary session, it would be judicial hypercriticism to declare his second notice or proclamation insufficient to authorize the Legislature to pass the act under consideration.''

We adopt the reasoning and conclusion of the above case in the construction of article 6, § 19 of our Constitution, *supra*. It follows that the power of the executive over the form of his proclamation and the subjects to be embraced therein, continues and is plenary until the Legislature has actually convened pursuant to the call contained in the proclamation. See *People ex rel. Tenant* v. *Parker,* 3 Neb. 409. The supplemental

proclamation of September 17, which included the act
under review for consideration by the Legislature,
expressly recites in its title that it is "A proclamation
supplemental and in addition to the proclamation calling
an extraordinary session of the General Assembly dated
September 8, 1923," and in the body of the proclama-
tion it is expressly recited that "the Governor did, on the
8th day of September, 1923, call an extraordinary session
of the General Assembly to convene at the capitol
building at the seat of government at the hour of 12:00
o'clock, M., on the 24th day of September, 1923," * * *
and that, in addition to the purposes therein enumerated,
others were added, including the act under review. The
subjects for legislative consideration mentioned in the
supplemental proclamation must be taken and considered
as much a part of the original proclamation as if they had
been expressly enumerated therein. We therefore con-
clude that the statute was properly enacted.

Since we hold that the statute under consideration
was properly enacted, being within the supplemental call
of the Governor, we reach the further question whether
the statute applies to the making up of the record in the
present case. The statute, as we have already seen,
did not go into effect until January 10, 1924, by reason
of the fact that there was no separate roll call as provided
in amendment No. 13 to the Constitution. This omission
did not render the act invalid, but merely affected the
validity of the emergency clause and rendered it inopera-
tive. Notwithstanding the fact that the statute did not
go into effect until after the trial of this cause in the chan-
cery court, it was indisputably in effect when the record
of the testimony was made up by the stenographer on
January 15, 1924, and filed with the clerk. The statute
related merely to procedure, and was applicable to proce-
dure pursued after it went into effect, even though the
cause was pending and the decree was rendered prior to
that time. The rule established by this court is that stat-
utes in regard to remedies in procedure may be construed
to apply to pending proceedings, and will be so applied

unless the language of the statute indicates a contrary intention. *Green* v. *Abraham*, 43 Ark. 420; *Sidway* v. *Lawson*, 58 Ark. 117; *Van Hook* v. *McNeil Monument Co.*, 107 Ark. 292. At the time the statute went into effect the proceedings in the trial court had come to an end, but this statute related to procedure on appeal and applied thereafter to the method of procedure in perfecting the appeal. No vested rights are disturbed by giving this effect to the statute, for, as we have already said, the statute only related to the remedy and not to any substantive right.

Our conclusion therefore is that the oral testimony has been properly preserved in the record, and we proceed to a review of the evidence for the purpose of determining whether or not the decree of the chancery court was correct—whether or not it was against the preponderance of the evidence.

The tract of land in controversy is situated in the oil district of Union County, a few miles from the town of Norphlet. Appellee and his wife resided on the lands in controversy until after the commencement of this action on June 14, 1923. Appellant Foster contends that the first deed was executed on the day of its date, May 10, 1923, in the town of Norphlet; that the deed was acknowledged by appellees, Buchanan Graves and wife, before R. E. Black, a notary public living in Camden, who happened to be at Norphlet on that day, and that Foster paid Graves, as consideration for the conveyance, the sum of $2,000 in currency—twenty bills, each of the denomination of $100. Foster testified further that he left town soon after the execution of the deed and went to Shreveport, Louisiana, without having recorded the deed, and that later, when he made a sale to another person of a portion of the royalty, it was discovered by the attorney examining the title that there was a slight defect in the deed from Graves, and that he thereupon caused a new deed to be prepared by an attorney at Camden, and that the last deed was executed by appellees and acknowledged

before the same notary, R. E. Black, at the home of appellees on the land in controversy.

Appellees both testified in the case, and each denied that they had executed either of the deeds or that they were acquainted with Foster. They denied that Foster and Black, or either of them, came to their home at any time to obtain the execution of a deed. In fact, they denied that they had ever had any transaction at all with Foster. This was all the testimony introduced by appellees except the testimony of one of their attorneys in contradiction of a statement made in the testimony of Black, the notary public who took the acknowledgments to the deeds.

Foster testified that he began negotiations with Graves for the purchase of the royalty in the latter part of March, 1923, and that, two or three days before the execution of the deed, he and Graves reached an agreement for the sale and purchase of one-half of the royalty for $2,000, and that Graves told him that he would bring his wife to Norphlet on the day named, for the purpose of executing the deed. He testified that he was at that time dealing in oil leases, and had had a notary named Wells to take acknowledgments for him, and that, after he met Graves and wife in Norphlet on the morning in question for the purpose of consummating the sale by the execution of the deed, he could not locate Wells, and that he got Black, a notary public from Camden, to take the acknowledgments, and that he paid Graves the consideration in cash in one hundred-dollar bills. He testified that, after failing to find Wells, he saw Black enter a restaurant, that he went into the restaurant and got Black and brought him out, and that the deed was acknowledged on the street, near a certain grocery store. He testified that before closing the deal with Graves he did not get an abstract of title, but called to see an abstract company and was shown a memorandum to the effect that Graves was the patentee of the land from the United States Government, and had not conveyed it away, which satisfied him without obtaining a certified abstract. He testified that, after being told later that there was a defect

in the deed, which was unacceptable to the purchaser with whom he had negotiated a sale of some of the royalty, he then procured a new deed, prepared by an attorney, and made an engagement with Black to go back and see Graves and get the new deed signed, which was done by Graves and his wife at their home, on May 29, 1923.

Black's testimony coincided with that of Foster. He testified that he had no interest in the litigation, but was merely called on to take the acknowledgments while he chanced to be in Norphlet on business, and that later, when it became necessary to get a new deed signed for the correction of errors in the old one, he went with Foster, at the latter's request, to the home of the Graves and there took their acknowledgment to the new deed. He testified that he was not very well acquainted with Graves at the time of the execution of the deed but had met him and talked with him a few weeks before this transaction, and that he had never met Graves' wife, Jennie, before that day and was not acquainted with her. He pointed out both Graves and his wife during the trial of the case in the court room as being the two persons who acknowledged the deed. Graves and wife were both illiterate negroes and signed by mark.

Foster and Black both testified that the second deed was executed during the forenoon of the day mentioned, and that it occurred on the front porch of the home of appellees. They both testified that a man by the name of Gamble was present when the first deed was executed, but that Gamble had been accidentally killed in Louisiana since that time; that a man by the name of Sexton was present when the second deed was executed at the home of appellees, but that Sexton was absent from the trial and then lived somewhere in Florida, his exact whereabouts being unknown to them. Foster testified that on the morning he secured the first deed from appellees he paid a man named Carter Bell for a lot he had purchased from the latter, and still had $600 in money left. Bell testified that, on the morning in question, Foster paid

him twelve dollars, balance due on a lot, and that he saw that Foster had a large roll of one-hundred-dollar bills, apparently as much as $2,500. He testified further that at the time this occurred Foster asked him if he had seen Buchanan Graves in town, and he told Foster that he had seen him there that morning. Neither Foster nor Bell claimed that the latter was present when the deed was executed.

Foster was subjected to a very rigid cross-examination as to where he got the money he used in paying for the alleged conveyance, and why he had not given checks on the bank instead of using currency. He undertook to give an account of the source of his accumulations, and there are some discrepancies or inconsistencies in his testimony.

It appears from the testimony of witness Black and other witnesses that about the time this suit was commenced Black was arrested for the alleged forgery and put in jail for a time before giving bond. He was asked whether or not he had, in conversation with Mr. Smead, one of the attorneys for appellees, while witness was confined in jail, stated that he did not know Buchanan Graves or his wife. Black's answer was that he had said to Mr. Smead that he saw them once before, and that he did not tell Mr. Smead that he did not know them. His testimony was, as before stated, that he had met and talked to Graves once before, but had never seen his wife before, and was not acquainted with her.

H. F. Flocker testified that on or about May 29, 1923, he was at work as a contractor in the construction of a pipe line near the home of Buchanan Graves, and that he saw R..E. Black standing close to the gate talking to another man, and that Foster, with whom he was also acquainted, was standing there with a paper in his hand, and that both Graves and his wife were present. He testified that he was not interested in this controversy and knew nothing about the facts except the mere circumstance of seeing Foster and Black at the home of appellees on that morning, that all he knew about it was that

he happened to be digging a pit about one hundred yards of Graves' house that morning and saw the parties there in the yard, as above stated.

Tom Cargile testified that he was acquainted with appellant Foster and also with R. E. Black and appellee, Buchanan Graves, and that he saw Black and Foster at the home of Graves in the latter part of May, about May 30, and noticed that Black had a paper in his hand and was doing some writing. He testified that he and his brother were out there looking for work.

Sam S. Cargile testified to the same effect as his brother Tom. They both stated that this occurred about 9:30 or 10 o'clock in the morning, and that as they passed they hollered "hello" to Black and saw that he had some papers and was doing some writing. It is to be borne in mind at this point that Graves and his wife both testified that they were not acquainted with either Foster or Black and that neither of those parties were at their house on any occasion.

Clyde Carter testified that he was in Norphlet on May 10, 1923, and while standing in front of a certain cafe or restaurant he saw a man, whom he recognized at the time the testimony was given as appellant, go into the restaurant and speak to R. E. Black and request him to do some notary work, and that appellant and Black left the restaurant together.

The law of this case has been fully settled by a recent decision of this court. *Miles v. Jerry,* 158 Ark. 314. The purported deeds having been duly recorded, the burden of proof is upon the party challenging their authenticity to prove his case by a preponderance of the evidence. The burden therefore rested on appellees to show by a preponderance of the evidence that the deeds were forged. The only affirmative testimony offered by appellees is that of their own. They are not corroborated by any other witness, while, on the other hand, Foster, who is interested to the same extent as each of the appellees, is corroborated in every detail by Black, who is disinterested except to the extent of his interest in the

assault that is made upon his own integrity in participating in the alleged forgery; and by witnesses Flocker, Tom Cargile and Sam Cargile, who are apparently disinterested, and who each testified that they saw Foster and Black at the home of the Graves talking to them and apparently carrying on a transaction which called for the execution of papers. This is in positive contradiction of the testimony of both of the appellees. If the testimony of these witnesses is true, then the testimony of both of the appellees is false. It is true that there are some inconsistencies in the details of Foster's testimony, especially with reference to the manner of his accumulation of the money and in paying for the conveyance. It may be said also that there are inconsistencies in the testimony of both of the appellees. It is likewise true that witness Black is, to some extent, contradicted by the testimony of Mr. Smead, one of the attorneys for appellees. But it must be remembered that this contradiction related to a conversation while Black was in jail, and the contradiction was so slight that it may be attributed to some misunderstanding as to just what particular words were used. Mr. Smead testified that he went to see Black while the latter was in jail, being then the attorney for appellees, and Black told him that he did not know "Buck" Graves and had not seen him to know him in his life, but that he had taken the acknowledgment of somebody. Black testified that he was not acquainted with Jennie Graves at all and had never seen her before the day the deed was executed, but he identified her when he saw her in the court room at the trial as being the woman who had executed the deed as the wife of Buchanan Graves. He testified that he was only slightly acquainted with Buchanan Graves, and that he talked to him once before the execution of the deed. Under these circumstances it can easily be seen that Mr. Smead may have misunderstood what Black said with reference to his acquaintance with the two persons, Graves and wife.

Making due allowances for the inconsistencies in all the testimony, we are of the opinion that the testimony

adduced by appellees does not preponderate, and that the finding that the deeds were forgeries was clearly against the preponderance of the evidence. In order to sustain that finding, we must. absolutely disregard the material testimony of witnesses not shown in the slightest degree to be interested in this litigation.

The decree of the chancery court was therefore erroneous, and the same is reversed, and the cause is remanded with directions to enter a decree dismissing the complaint for want of equity.

McCULLOCH, C. J., dissents.

### OPINION ON REHEARING.

WOOD, J. We are asked to reconsider the conclusions reached on the questions involved, both of fact and of law, and, having done so, we adhere to the conclusions expressed in the former opinion. Appellees have filed here since our decision was rendered the affidavit of R. E. Black, one of the material witnesses, repudiating his testimony given at the trial below, and they ask that the judgment of the court be modified so as to allow a retrial of the issues on remand of the cause, instead of directing the entry of a decree. Counter affidavits have been filed by both parties bearing on the question whether the witness did in fact voluntarily repudiate his testmony, or whether he was, as he since claims, coerced or imposed upon. We cannot consider any of those affidavits for the purpose of testing the correctness of our decision or the correctness of the decision of the chancery court, as the record made in the court below must furnish the sole test. We can, however, consider those affidavits for the purpose of determining whether or not a retrial of the issues should be permitted.

The usual practice on appeals in chancery cases is to end the controversy here by final judgment, or by direction to the lower court to enter a final decree, but there are exceptions, and it rests in the discretion of this court to determine, under the circumstances, whether, upon a reversal of a chancery cause, the same should be

opened for a new trial. *Carmack* v. *Lovett,* 44 Ark. 180; *Long* v. *Chas. T. Abeles & Co.,* 77 Ark. 156; *Gaither* v. *Gage,* 82 Ark. 51; *Carlisle* v. *Carrigan,* 83 Ark. 136. Here the circumstances are peculiar and unusual.

The fact that there is evidence of a repudiation by such a material witness as Black of his former testimony presents a situation which makes it appropriate to permit the facts to be re-examined in the trial court. We are not at liberty to determine here whether or not the witness has in fact voluntarily repudiated his former testimony, but we consider it only for the purpose of determining whether or not we should vary the usual practice, by sending the case back for a retrial after having reached the conclusion on the record before us, which was made in the lower court, that the evidence is insufficient to warrant the decree of the chancery court.

The former judgment of this court will therefore be amended so that on remand of the cause to the chancery court for further proceedings the cause will be reopened and the parties on each side may be permitted to introduce further testimony bearing upon all the issues. The cause will be retried by the chancery court. The petition of appellee for a rehearing is in all other respects denied.

McCULLOCH, C. J., (dissenting). My only difference with the majority of the court relates to that part of the opinion which holds that the Governor has the power, after he has called an extraordinary session of the General Assembly, to enlarge the subjects to be considered. In my judgment the executive has no such power. It is true that in the case of *Sims* v. *Weldon,* 165 Ark. 13, holding that the Governor had no right to enlarge the subjects by supplement after the Legislature convenes, we pretermitted the question whether or not he could do so before the extraordinary session begins. But it seems to me that it necessarily follows from that decision that if the Governor has no power to issue a supplemental call or to enlarge the subjects of legislation after the

session begins, he has no power to do so before them.
There is no distinction whatever that I can observe. If
his power is not exhausted by the first call, there is no
reason why he does not under the Constitution possess
the power to continue to enlarge the subjects after the
session begins.

The executive authority to call a special session of
the Legislature is an extraordinary power, and the Con-
stitution itself specifies in detail how that power shall
be exercised and what authority shall result therefrom
to the General Assembly itself. The Constitution (Art.
6, § 19) specifies a single act for the Governor to per-
form, and that is that he may "by proclamation on
extraordinary occasions convene the General Assembly,"
and "shall specify in his proclamation the purpose for
which they are convened." Certainly there is no express
authority to do anything more than that, and it seems
to me that, as the Constitution proceeds at that point to
a detailed statement of the powers of the Legislature, it
excludes any additional power on the part of the exe-
cutive. In other words, the Constitution authorizes him
to issue one proclamation calling that particular session
of the Legislature, and he shall specify in that single proc-
lamation the subjects of legislation which are to be con-
sidered. It is true that there are no limitations upon
the number of special sessions that he may call, but there
is a clearly implied limitation upon his acts with respect
to any one particular session. I think that the execu-
tive's power is exhausted when he issues a proclamation
calling a session and specifying the subjects of legisla-
tion. By that act he creates the authority for the con-
vening of the Legislature and limits the subject of legis-
lation, and then his power ceases. He has no authority
to revoke the call, for the exercise of it has gone beyond
his control. Neither has he any authority to enlarge the
scope of the legislation, for the Constitution in express
terms leaves it to the General Assembly itself to deter-
mine when and under what circumstances other matters
may be considered.

The purpose of calling a special session of the General Assembly is to meet unforseen emergencies of great import. The Constitution says that such session may be called "on extraordinary occasions," meaning of course, in great emergencies. The thought that was in the minds of the framers of the Constitution was that when those emergencies arose the Governor would know and would be prepared to state the subjects, which were thought to be sufficient to meet the extraordinary situation then impending. It is true that the chief executive himself is the sole judge of the necessity for the call or the subjects upon which there is to be emergency legislation, but in conceding to him authority to amend his call and to add other subjects of legislation we must assume that he has found that a new emergency has arisen which is sufficient to call into exercise his extraordinary powers. I think that if the framers of the Constitution had intended to confer any such continuing power upon the executive, they would have said so in plain language.