Tulsi BHARODIA and Amratben Patel *v.*
Norman and Linda PLEDGER

99-681                                                    11 S.W.3d 540

Supreme Court of Arkansas
Opinion delivered March 2, 2000
[Petition for rehearing denied April 20, 2000. * ]

---

*Hilburn, Calhoon, Harper, Pruniski & Calhoon, Ltd.*, by: *Susan Gordon Gunter*, for appellants.

*Morgan Welch & Associates*, for appellees.

RAY THORNTON, Justice. Appellants, Tulsi Bharodia and Amratben Patel (the buyers), and appellees, Norman and

Linda Pledger (the sellers) entered into a contract for the purchase of appellees' home. Eleven days later, the buyers sought to terminate the contract. Although the buyers had several grounds for termination, including inability to obtain financing and the failure of the sellers to provide a "sellers' disclosure statement" as required by the contract, the buyers gave notice of the existence of a number of defects including structural problems, and, rather than requesting repairs, sought to terminate the contract. When the sellers did not return the escrow account, the buyers formally notified the sellers of the breach, by letter, declaring the contract null and void based on the sellers' failure to provide the required disclosure statement, inability to obtain financing, and structural defects. Seven months later the sellers filed suit seeking specific performance of the contract and thereafter the trial court granted the sellers' request, finding that by giving the sellers notice of structural defects the buyers had waived their other grounds for terminating the contract. The court of appeals affirmed the trial court by a three-to-three decision, and we granted review of the case.[1] We review the decision of the trial court and conclude that the trial court erred and must be reversed.

On August 3, 1994, the McKay Realty Company showed the buyers the home belonging to the sellers. On that same day the buyers executed an offer of $425,000 for the purchase of the home. This offer was made using a form provided by McKay and contained numerous conditions which the parties were to perform to fulfill the terms of the agreement. Pursuant to the terms of the contract, the buyers also gave the sellers' agent, Real Estate Central, $5000 in earnest money.

On August 4, 1994, the sellers accepted the buyers' offer. The following day, the buyers sought financing from Worthen Bank for the purchase. On August 9, 1994, the buyers had the sellers' home inspected. On August 12, 1994, the buyers received their inspection report. The report noted many defects in the home including structural problems.

On August 15, 1994, the buyers went to the McKay Company and executed two documents. The first document was titled "addendum to offer and acceptance," and after noting the results of

---

[1] *See Bharodia v. Pledger*, 66 Ark. App. 349, 990 S.W.2d 581 (1999).

the inspection report, stated that "as a result of this report and minor and structural repairs needed, buyer requests to be released from the offer and acceptance." The second document was titled "termination of contract-handling of earnest money"and requested that the buyers' earnest money be returned. This was timely notice under the terms of the offer and acceptance provision that such notice be given "within ten business days after acceptance of the contract."

On August 17, 1994, the sellers had an engineer inspect the home and prepare a report of defects. No disclosure statement by the sellers was provided to the buyers as required by the contract. On September 9, 1994, the buyers, through their attorney, wrote a letter to the sellers' agent stating that the contract was null and void for three reasons: (1) failure to receive financing; (2) damages to the home of more than $2000; and (3) the sellers' failure to deliver a "sellers' disclosure statement." The buyers further requested that their earnest money be returned.

On December 2, 1994, Real Estate Central interpled the buyers' earnest money into the registry of the Sherwood Municipal Court and the court transferred the matter to the Pulaski Country Chancery Court. On April 13, 1995, the sellers filed a suit in chancery court for specific performance of the contract. On May 5, 1995, the buyers filed an amended answer to the sellers' complaint and a counterclaim. In their counter claim, the buyers argued that the contract was null and void because of the inability to obtain financing, the defects in the structure, and the sellers' failure to provide a disclosure statement. For those reasons the buyers once again argued that specific performance was not warranted and requested the return of their earnest money.

Both parties moved for summary judgment and the chancellor denied their requests. A trial on the matter was held in April 1997. On July 14, 1997, the chancellor granted the sellers' request for specific performance. The chancellor found that the sellers had failed to give the buyers "a sellers' disclosure statement." However, he also found that the buyers could not rely on the sellers' failure to deliver this document as a support for termination of the contract because they had waived such a defense. On January 7, 1998, the chancellor awarded the sellers $5000 in attorneys' fees pursuant to Ark. Code Ann. § 16-22-308 (Repl. 1999).

The buyers appealed this matter to the court of appeals. On May 26, 1999, in a three-to-three decision, the court affirmed the trial court. We accepted review of this case on July 15, 1999, and now reverse the trial court.

On appeal, we consider chancery cases *de novo* on the record, but we do not reverse a finding of fact by the chancellor unless it is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Campbell v. Campbell*, 336 Ark. 379, 985 S.W.2d 724 (1999).

In their first point on appeal, the buyers contend that the chancellor erred when he denied their motion for summary judgment. We are unable to address this point on review. We have repeatedly held that the denial of a motion for summary judgment is not subject to review or appeal. *Daniels v. Colonial Ins. Co.*, 314 Ark. 49, 857 S.W.2d 162 (1993). *See also, Hastings v. Planters & Stockmen Bank*, 307 Ark. 34, 818 S.W.2d 239 (1991); *McElroy v. Grisham*, 306 Ark. 4, 810 S.W.2d 933 (1991).

In their second point on appeal, the buyers argue that the chancellor's granting of specific performance was erroneous because by keeping the buyers' earnest money, the sellers had elected to take liquidated damages instead of specific performance as their remedy. The buyers' argument is not subject to our review. We have held that the doctrine of election of remedies is an affirmative defense and must be raised in an answer. *See Southern Farmers Assoc., Inc. v. Wyatt*, 234 Ark. 649, 353 S.W.2d 531 (1962). The issue of the sellers' election of remedies was not raised in this case until the buyers filed a motion for summary judgment on January 16, 1996. Thus, because the buyers failed to raise this defense in their answer, they were precluded from arguing it at any other stage in the case as a defense to the sellers' request for specific performance.

In their third point on appeal, the buyers urge that we should rule as a matter of law that sellers of real estate contracts are not entitled to specific performance. First, it should be noted that the buyers are asking us to deviate from our prior case law. We have held that there is a strong presumption of the validity of prior decisions. *Independence Fed. Bank v. Webber*, 302 Ark. 324, 789

S.W.2d 725 (1990). Although we do have the power to overrule previous decisions, it is necessary as a matter of public policy to uphold prior decisions unless great injury or injustice would result. *Id.* In *Arkansas Office of Child Support Enfcm't v. Mitchell,* 330 Ark. 338, 954 S.W.2d 907 (1997), we explained the public policy behind such a doctrine. We stated:

> [T]he policy behind stare decisis is to lend predictability and stability to the law. *Paris v. Pitts,* 244 Ark. 1239, 429 S.W.2d 45 (1968)(superseded by statute on other grounds). In matters of practice, "adherence by a court to its own decisions is necessary and proper for the regularity and uniformity of practice, and that litigants may know with certainty the rules by which they must be governed in the conducting of their cases." *Brickhouse v. Hill,* 167 Ark. 513, 523, 268 S.W. 865, 868 (1925) (quoting 7 R.C.L. 1008 (1915)). In *Parish,* this court held that "[p]recedent governs until it gives a result so patently wrong, so manifestly unjust, that a break becomes unavoidable." *Parish,* 244 Ark. at 1252, 429 S.W.2d at 52.

*Mitchell, supra.*

■■ Remaining mindful of these principles, it should also be noted that we have repeatedly held that specific performance is an appropriate remedy for sellers of real estate. In a 1939 case we held that:

> [I]n the case of real estate specific performance is decreed almost as a matter of course when the contract has been properly established and is unobjectionable in any of its features which address themselves to the chancellor's discretion. Under such circumstances the vendee is entitled to have the contract specifically enforced irrespective of his right to recover damages for its breach. In other words, where the land is the subject-matter of the agreement, the jurisdiction of equity does not depend upon the existence of special facts showing the inadequacy of a legal remedy in the particular case, but the presumption arises that damages will not constitute an adequate remedy. Damages are not regarded as the equivalent of the specific relief because the exact counterpart of any particular piece of real estate does not exist anywhere else in the world.

*Dickinson v. Mckenzie*, 197 Ark. 746, 126 S.W.2d 95 (1939). *See also, Loveless v. Diehl*, 236 Ark. 129, 364 S.W.2d 317 (1962); *Dollar v. Knight*, 145 Ark. 522, 224 S.W.983 (1920). Thus, because the buyers have given us no reason to overturn our previous decisions and because we have allowed both the buyers and the sellers of land to seek specific performance on real estate contracts throughout our case law we do not chose to overrule precedent.

We turn now to the two points urged by the buyers that the trial court erred in finding that the buyers waived their right to declare the contract null and void for the breach by the sellers of the provision requiring a "sellers' disclosure statement." There is no challenge to the chancellor's finding that the disclosure statement was not provided as required in the contract. The buyers contend that the chancellor erred when he found that this provision was waived because they failed to specifically articulate it in their August 15, 1994, notice to the sellers. We agree with the buyers that this provision was not waived. The contract in relevant part states:

> [S]eller will provide to buyer a disclosure about the condition of the property which will contain information that it is true and correct to the best of the seller's knowledge. The disclosure will be presented to buyer within three business days of acceptance of this offer. Buyer has three business days after receipt of disclosure to accept or reject said disclosure. *If seller fails to provide the disclosure in a timely manner, or if buyer finds the disclosure unacceptable within three business days after receipt, this contract may be declared null and void* by the buyer, with buyer to receive a refund of the earnest money.[2] (Emphasis added.)

The chancellor found on this issue that:

> [The buyers] in terminating the contract on August 15, 1994, did not list as one of their reasons the failure to receive the sellers' disclosure statement . . . . The court finds that [the sellers] have the burden of proof to show that [the buyers] received the sellers' disclosure statement. There is no signed receipt by [the buyers] of receiving the disclosure statement and no corroborating evidence that [they] actually received the document. Since the burden of

---

[2] It should be noted that the buyers were not required to act until after receipt of the "sellers' disclosure statement."

proof is on [the sellers] to prove that [the buyers] received the document, the Court finds that [the sellers] failed in their burden of proof. Therefore, the Court finds that [the buyers] did not receive the sellers' disclosure statement.

[The buyers] terminated the contract with [the sellers] by stating that there were alleged structural defects in the home. [The buyers] did not give as one of the reasons for termination the failure to receive the disclosure statement. Even though [the buyers] had a right to terminate the contract for not receiving the disclosure statement, the Court finds [the buyers] waived their right to terminate the contract using that as a reason....

Waiver is the voluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall forever be deprived of its benefits. *Pearson v. Henrickson*, 336 Ark. 12, 983 S.W.2d 419 (1999). It may occur when one, with full knowledge of material facts, does something which is inconsistent with the right or his intention to rely upon that right. The relinquishment of the right must be intentional. *Id.*

In this case, we find no showing that the buyers knowingly and intentionally waived any provisions of the contract or that they made a voluntary abandonment of a right known to them, with the intent that they would forever be deprived of its benefits. Rather than waiving their right to nullify the contract for seller's failure to provide them with a "sellers' disclosure statement," the buyers continuously argued this right to terminate the contract at every stage of the litigation. On September 9, 1994, merely three weeks after the August 15, 1994, notice was sent to the sellers, and seven months prior to the filing of any litigation in the matter, the buyers' attorney argued this breach as reason for terminating the contract in his letter to Real Estate Central. This argument was again made by the buyers in their answer and counterclaim to the sellers' specific performance suit. Throughout the trial the buyers never abandoned their right to terminate the contract based on the sellers' breach.

The facts in the present case can be contrasted with the facts in *Grayson-McLeod Lumber Co. v. Slack Kress Tie & Stave, Co.*, 102 Ark. 79, 143 S.W.2d 79 (1912) where we held that the buyers had waived their right to terminate the contract based on the sellers' breaches. Specifically, we held that appellant could not rely on the sellers' breach when the breaches were made "a considerable

length of time before appellant decided to terminate the contract" and appellant had made no objections to the breaches but instead allowed the sellers to continue with the terms of the contract. *Id.* We conclude that in the case now on review there was no knowing and intentional waiver of the buyers' right to terminate the contract.

■ In the absence of a knowing and intentional waiver, a party may claim a waiver by estoppel has occurred. Arthur Corbin, in his treatise on contracts, explained:

> It is sometimes said that a promisor who states an insufficient reason for refusing to perform his promise can not afterwards defend by showing that another and justifying reason existed. That is not correct. If a condition of his duty to perform did not in fact exist or occur, he was privileged not to perform. That he did not refer to this condition and that he gave bad reasons is not material as long as there has been no change of position in reasonable reliance upon the promisor's disregard of the unperformed condition. An estoppel may arise, preventing the promisor from setting up his otherwise good defense; but his mere omission to mention that defense and his statement of bad reasons are not sufficient to raise an estoppel... Mere omission to claim the defense and giving other reasons for refusal to perform are not themselves a waiver... There is no estoppel in the absence of a change of position in reasonable reliance.

3A Arthur Corbin, *Corbin on Contracts; A Comprehensive Treatise on the Rules of Contract Law* § 762, (1960).

■ Here, although the buyers did not list the sellers' failure to deliver the "sellers' disclosure statement" as a reason for terminating the contract in their August 15, 1994, notice, they were not estopped from raising the sellers' breach of contract at a later time. There is no showing that the buyers encouraged the sellers to engage in any repairs to their home, nor was there any evidence showing that the buyers induced the sellers to take other actions. Specifically, on August 15, 1994, the buyers sent the sellers notice that they were terminating the contract because the structure needed minor and structural repairs. The notice did not request the sellers to take any action other than returning the money in the escrow account. However, the sellers hired an engineer to inspect the home following the buyers' notice, but they did not complete

the repairs described in the buyers' inspection report nor did they repair the defects detailed in their engineer's report. Under these circumstances we find no estoppel should have been imposed to prevent the buyers from exercising the right to terminate the agreement due to the sellers' breach of the conditions of the contract requiring the delivery of a "sellers' disclosure statement" and hold that the chancellor's findings were clearly erroneous.

In their final point on appeal, the buyers contend that the chancellor erred when he granted the sellers' request for attorneys' fees. The chancellor's order found that "plaintiffs are entitled to attorneys' fees as authorized by Ark. Code Ann. §16-22-308 and *Childs v. Adams*, 322 Ark. 424, 909 S.W.2d 641 (1995)." Arkansas Code Annotated Section 16-22-308 states:

> In any civil action to recover on an open account, statement of account, account stated, promissory note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney fee to be assessed by the court and collected as costs.

*Id.* The award of an attorney's fee is a matter which is addressed to the sound discretion of the court and, in the absence of abuse, its judgment will be sustained on appeal. *New Hampshire Ins. Co. v. Quilantan,* 269 Ark. 359, 601 S.W.2d 836 (1980).

In the present case, the sellers requested $35,845.50 in attorneys' fees and the chancellor awarded the sellers $5000 in attorneys' fees. Because we have held that the chancellor erred in granting specific performance, we must also hold that the granting of the sellers' request for attorneys' fees was erroneous.

Reversed and remanded.

CORBIN, J., not participating.

GLAZE and IMBER, JJ., dissent.

TOM GLAZE, Justice, dissenting. The parties' "Offer and Acceptance" form contract provided the buyers several potential grounds for terminating the contract. These provisions are

fully set out in the excerpts from the Offer and Acceptance, Plaintiff's Exhibit 4, attached to this opinion.

Under paragraph 16(B) of the Offer and Acceptance, the buyers had a right to inspect the property within ten business days after acceptance of the contract. Upon inspection, if the buyers discovered items needing repair, and provided timely written notice of that fact to the sellers, the seller agreed to repair those items up to a repair limit of $2,000.00. If sellers refused to make repairs beyond the repair limit, one of the buyers' options would be to declare the contract null and void.

Under paragraph 17(C), the sellers agreed to provide the buyers with a statement disclosing the condition of the property within three business days of acceptance of the offer. Under this provision, the buyers could declare the contract null and void, "[i]f Seller fails to provide the disclosure in a timely manner, or if Buyer finds the disclosure unacceptable within three (3) business days after receipt...." Under the above provisions, the buyers could recover their earnest money if the sellers breached either of the provisions, 16(B) or 17(C).

The buyers executed their Offer and Acceptance on August 4, 1994. The sellers accepted the offer on the same day. The court below found that the sellers failed to provide a disclosure statement. Instead of exercising their rights under paragraph 17(C), the disclosure statement provision, the buyers hired a home inspector who performed an inspection on August 9, 1994. After reviewing the resulting inspection report, on August 15, 1994, the buyers faxed two contract addenda to the sellers. The first addendum, marked Plaintiff's Exhibit 6, is attached for the reader's convenience.

In Plaintiff's Exhibit 6, captioned Inspection and Repairs, *the buyers expressly invoked their rights under paragraph 16(B)*. That paragraph reads, "Buyer chose ... to perform the inspection ... allowed in Paragraph 16(B) [of] the Offer and Acceptance and to provide ... a list of repairs needed." Additionally, Exhibit 6 notes that the buyers have inspected the property, attached relevant portions of the inspection report, and reserved their right to reinspect the property prior to closing. Exhibit 6 further reflects that the buyers requested release from the offer and acceptance. The sellers, pursuant to the terms in 16(B), had their engineer inspect the structural

integrity of the house and the engineer stated that the suggested corrections could be made. The sellers said that they would make any repairs required in order to sell the property, and in fact, the sellers commenced work to do so. The buyers, however, refused to proceed to give the sellers the opportunity to perform the contract. The buyers' second addendum merely requested that the sellers return the buyers' earnest money through an agreed termination of the contract. Neither addendum invoked, or even mentioned, the buyers' rights under paragraph 17(C), the disclosure statement provision.

By knowingly and intentionally invoking their rights to inspect the property, demand repairs and reserve their right to reinspect under 16(B), the buyers triggered a provision which allowed the sellers an opportunity to make repairs to the home consistent with the buyers' inspection. The closing date on the contract was set for August 31, 1994. The record reveals that, by August 24, 1994, the sellers had hired a structural engineer and received his report on the needed structural repairs, which he concluded could be corrected. The sellers then expressed a willingness and in fact acted to complete all necessary repairs, as was their right under the inspection and repair provisions of paragraph 16(B) of the contract. Nevertheless, the buyers refused to close on the house.

On September 9, 1994, in a letter from the buyers' attorney to the sellers, the buyers for the first time attempted to assert their rights under disclosure statement provision 17(C). In other words, almost a month had passed since the buyers had invoked the inspection and repair clause, causing the sellers to commence repairs to the property. The buyers breached the contract through their adamant refusal to close on the deal.[1]

In conclusion, the most puzzling aspect of the majority opinion is its statement that, "although the buyers did not list the 'sellers' failure to deliver the sellers' disclosure statement' as a reason for terminating the contract in their August 15, 1994 notice, they

---

[1] The seller Bharodia denied being a sophisticated buyer of real estate, but the proof clearly established that he had purchased motels such as a Holiday Inn, a Comfort Inn, and a Ramada Inn. He also admitted to purchasing residential property and having been involved in litigation on prior occasions. In short, the buyers cannot take refuge as a new or unknowledgeable purchaser in the real estate market.

were not estopped from raising the sellers' breach of contract at a later time." The majority merely rewrites the parties' contract. Once again, the sellers had the right (and the buyers acknowledged that right) under Subsection 16(B) to cure any defects. The Pledgers cannot be estopped from doing what the parties' contract authorized them to do.

Because the record supports the chancellor's finding that the buyers chose to proceed under provision 16(B) and thereby waived their rights under provision 17(C), I cannot say the chancellor was clearly erroneous.

IMBER, J., joins this dissent.

## Offer and Acceptance

Page 3 of 4

Copyright 1994 Arkansas Realtors Association 94

14. FIXTURES AND ATTACHED EQUIPMENT: Unless specifically excluded herein, all fixtures and attached equipment, if any, are included in the Purchase Price. Such fixtures and attached equipment shall include but not be limited to the following: dishwasher, disposal, trash compactor, ranges, exhaust fans, heating and air conditioning systems, plumbing system, electrical system, intercom system, _aa_ ceiling fans, _____ window air conditioners, carpeting, indoor and outdoor light fixtures, window and door coverings and related hardware, gas or electric grills, awnings, mailboxes, garage door openers and _____ remote controls, antennas, fireplace inserts, _no built in furniture_ _built in refrig, freezer ice maker_ _____ and any other items bolted, nailed, screwed, buried or otherwise attached to the Property in a permanent manner. Also, television satellite receiver equipment, water softeners, and propane and butane tanks remain, if owned by Seller. The Buyer is aware the following items are not owned by Seller _____

15. BUYER'S DISCLAIMER OF RELIANCE: BUYER CERTIFIES THAT BUYER HAS PERSONALLY INSPECTED, OR HAD A REPRESENTATIVE INSPECT, THE PROPERTY AS FULLY AS BUYER DESIRES AND IS NOT HEREAFTER RELY UPON ANY WARRANTIES, REPRESENTATIONS OR STATEMENTS OR STATEMENTS OF THE SELLING AGENT FIRM, THE SELLING AGENT FIRM, OR ANY AGENT, INDEPENDENT CONTRACTOR, OR EMPLOYEE ASSOCIATED WITH THOSE ENTITIES, REGARDING THE AGE, SIZE, QUALITY, VALUE OR CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION ALL IMPROVEMENTS, ELECTRICAL OR MECHANICAL SYSTEMS, PLUMBING OR APPLIANCES, OTHER THAN THOSE SPECIFIED HEREIN, IF ANY, WHETHER OR NOT ANY EXISTING DEFECTS IN ANY SUCH REAL OR PERSONAL PROPERTY MAY BE REASONABLY DISCOVERABLE BY BUYER OR A REPRESENTATIVE HIRED BY BUYER.

16. INSPECTION AND REPAIRS:

☐ A. Buyer agrees to accept the Property "as is," subject only to the following:

The benefits of an inspection have been explained to the Buyer and the Buyer is declining to inspect the Property as offered in paragraph 16(B). The Buyer further agrees to hold the Listing Agent Firm and the Selling Agent Firm involved in this contract harmless of any problems relative to the mechanical or structural defect or failure in any of the components of the Property that may exist or be discovered in the future.

☑ B. Buyer agrees to accept the Property "as is," in its present condition, provided that the following items, if in or on the Property, shall be in normal working order at closing electrical, plumbing, heating and air conditioning systems, dishwashers, disposals, trash compactors, ranges, exhaust and ceiling fans, water heaters, garage door openers, remote controls, and _____

Buyer shall have the right, at Buyer's expense, to inspect further the above items, and all improvements and structures, and components thereof, on or about the Property (collectively, the "inspection items") within ten (10) business days after acceptance of this contract. Seller, the Listing Agent Firm and the Selling Agent Firm recommend that Buyer use any representative chosen by Buyer, to inspect the inspection items within this time period. Buyer shall give written notice so that it is actually received within the allotted ten (10) day period by Seller or the Listing Agent Firm, stating that the inspection has been performed and listing all items which need repair, except repairs required by FHA, VA, the lender, or the termite control company ("Third Party Requirements"), which may be supplied promptly upon receipt.

The Third Party Requirements shall be delivered to Seller or the Listing Agent Firm promptly upon receipt by Buyer. IF THE BUYER DOES NOT TIMELY PROVIDE THE WRITTEN NOTICE AS REQUIRED, THE INSPECTION ITEMS AND THE THIRD-PARTY REQUIREMENTS ARE TO BE DEEMED ACCEPTABLE TO BUYER AND THE COST OF REPAIRING ANY DEFECTS IN THE INSPECTION ITEMS SHALL BE SOLELY AT BUYER'S EXPENSE. If timely notice as provided herein is given, Seller agrees to pay the reasonable cost to repair Inspection Items and Third-Party Requirements, up to but not exceeding $ _300000_ (the "Repair Limit"). If repair costs exceed the Repair Limit and Seller refuses to pay the cost of repairs over the Repair Limit, Buyer may accept the Property in its condition at closing with credit to Buyer at closing in the amount of the Repair Limit, less the cost of any repairs made and paid for by Seller after receipt of notice, or Buyer may declare this contract null and void and receive the earnest money. If Buyer closes on the Property and agrees to take a credit equal to the Repair Limit as Buyer is allowed by the Paragraph 16(B), Buyer waives the right to assert a claim against the Seller, Selling Agent Firm or the Listing Agent Firm.

Buyer shall have the right to reinspect the inspection items immediately prior to closing to ascertain whether the Inspection Items are still in normal working order and to insure that all designated repairs have been made. If the Inspection Items are not found to be in normal working order upon reinspection, Buyer may either accept the Property in its condition at closing with credit to Buyer at closing only for any portion of the Repair Limit which has not already been spent by Seller for repairs or previously credited to Buyer under this paragraph 16(B), or Buyer may declare this contract null and void if Seller refuses to spend more than the Repair Limit. SELLER SHALL NOT BE OBLIGATED TO EXPEND FOR REPAIRS, OR PROVIDE A CREDIT AGAINST THE PURCHASE PRICE CONCERNING REPAIRS, AN AMOUNT IN EXCESS OF THE REPAIR LIMIT.

If the Property being purchased is not new, Buyer acknowledges that the Inspection Items may not be new. Buyer does not expect the Inspection Items to be like new and recognizes that ordinary wear and tear to the Inspection Items is normal. For the purpose of the Paragraph 16(B), "normal working order" means that the Inspection Items function for the purpose for which they are intended. The fact that any or all of the Inspection Items may cease to be in normal working order after closing shall not require any repair by the Seller, or legal or other liability to the Seller, the Listing Agent Firm or the Selling Agent Firm.

17. SELLER DISCLOSURE:

☐ A. Buyer has neither received nor requested from Seller a written disclosure concerning the condition of the Property prior to the execution of this contract, but this fact neither limits nor restricts in any way the Buyer's Disclaimer of Reliance set forth in Paragraph 15 of this contract. BUYER IS STRONGLY URGED BY THE SELLING AGENT FIRM AND THE LISTING AGENT FIRM TO MAKE ALL INDEPENDENT PROPERTY CONDITION INSPECTIONS DEEMED NECESSARY PRIOR TO SIGNING THIS CONTRACT, IN ADDITION TO THOSE INSPECTIONS PERMITTED BY PARAGRAPH 16(B) OF THIS CONTRACT.

☐ B. Buyer and Seller acknowledge that, upon the instruction of the Seller, either the Selling Agent Firm or the Listing Agent Firm have delivered to Buyer, prior to the execution of this contract, a written disclosure prepared by Seller concerning the condition of the Property, but this fact neither limits nor restricts in any way the Buyer's Disclaimer of Reliance set forth in Paragraph 15 of this contract, nor the rights provided Buyer in Paragraph 16(B). The written disclosure prepared by Seller is dated _____ and is warranted by Seller to be the latest disclosure and the answers contained in the disclosure are true and correct to the best of the Seller's knowledge.

☑ C. Seller will provide to Buyer a disclosure about the condition of the Property which will contain information that it is true and correct to the best of the Seller's knowledge. The disclosure will be presented to Buyer within three (3) business days of acceptance of this offer. Buyer has three (3) business days after receipt of disclosure to accept or reject said disclosure. If Seller fails to provide disclosure within three (3) business days, or if Buyer finds the disclosure unacceptable within three (3) business days after receipt, this contract may be declared null and void by the Buyer, with Buyer to receive a refund of the earnest money. Receipt of this disclosure neither limits nor restricts in any way the Buyer's Disclaimer of Reliance set forth in Paragraph 15 of this contract.

18. HOME WARRANTY PLANS:

The Buyer understands the benefits of a home warranty contract which may include coverage for most major appliances, plumbing, electrical, heating and air conditioning systems. The home warranty contract covers unexpected mechanical failures due to wear and tear and is subject to a per claim deductible. The availability of a home warranty contract, cost and applicable deductible have been explained to the Buyer, and the Buyer chooses:

☑ A. No home warranty contract concerning the condition or usefulness of any real or personal property to be conveyed from Seller to Buyer for any period after the closing

☐ B. A limited home warranty plan will be provided to Buyer concerning the condition or usefulness of the Property and will be paid for by _____ at a cost not to exceed $ _____ This home warranty contract will not imply any warranty by Seller after closing and the items covered by said home warranty contract will be agreed to by a separate agreement between the Buyer and the warranting company

☐ C. OTHER WARRANTY _____

19. TERMITE CONTROL REQUIREMENTS:

☐ A. None

☑ B. Unless otherwise specified, Seller shall furnish to Buyer, at Seller's cost, a certificate from a licensed termite control company. If Buyer is obtaining financing, such certificate shall be in a form acceptable to the lender

1541

## Addendum To
## Offer and Acceptance
Page 1 of 1

RECEIVED

FEB 1 3 1995

ARK. REAL ESTATE COMMISSION

REALTOR®  94

Copyright 1994
Arkansas
Realtors
Association

Regarding the Offer and Acceptance dated _August 3rd, 1994_ between the Buyer _Tom & Amrat Bharodia_
and the Seller, _Mr & Mrs_ _Pledger_ covering the real property (the "Property") known as
_Lot 7 Block 48, Lakewood Heights AKA 7 Lakewood_.

The Undersigned Buyer and Seller hereby agree to the following:

### INSPECTION AND REPAIRS

**BUYER CHOSE:**

☒ 1. To use a representative of the Buyer's choosing to perform the inspection suggested and allowed in Paragraph 16(B) the Offer and Acceptance and to provide in the space below a list of repairs needed. Buyer reserves the right to reinspect the Property prior to closing to make sure all repairs have been done and that nothing else needs repair.

☐ 2. To personally make the inspection suggested and allowed in Paragraph 16(b) of the Offer and Acceptance and to provide in the space below a list of repairs needed. Buyer is not relying on any expertise other than that possessed by Buyer. Buyer reserves the right to reinspect the Property prior to closing to make sure all repairs have been done and that nothing else needs repair

☐ 3. Buyer waives all rights of inspection and reinspection and accepts the Property in its present condition, intentionally disregarding the rights provide to Buyer in Paragraph 16(B) of the Offer and Acceptance.

List of repairs requested by Buyer other than FHA, VA, Lender or Termite Control Company requirements("Third-Party Requirements")

_Please see attached Comment section from Inspection Report_
_All problems have been noted by underlining._

_As a result of this Report & the minor & structural_
_repairs needed buyer requests to be released from the_
_offer & acceptance_

_Tulshi_ _____ _8-15-94_
Buyer          Buyer                    Date

List of repairs needed was submitted to Seller or Listing Agent Firm within (10) business days allowed by the Offer and Acceptance.

_____    _____    _____
Seller or Listing Agent Firm    Seller or Listing Agent Firm    Date

Seller agrees to complete the list of repairs above and the Third Party Requirements, except for the following: _____

_____    _____    _____
Seller or Listing Agent Firm    Seller or Listing Agent Firm    Date

This addendum, upon its execution by both parties, incorporates by reference all provisions of the above-referenced Offer and Acceptance not expressly modified herein. Buyer has completed all inspections Buyer wishes to perform and accepts the Property in its present condition.

THIS IS A LEGALLY BINDING CONTRACT WHEN SIGNED BY BOTH BUYER AND SELLER. READ IT CAREFULLY. IF YOU DO NOT UNDERSTAND THE EFFECT OF ANY PART OR IF YOU ARE UNCERTAIN CONCERNING ANY AGENCY RELATIONSHIPS TO EITHER THE BUYER OR SELLER, CONSULT YOUR ATTORNEY BEFORE SIGNING. REAL ESTATE AGENTS CANNOT GIVE YOU LEGAL ADVICE.

THE SELLER, THE BUYER, THE LISTING AGENT FIRM AND/OR THE SELLING AGENT FIRM INVOLVED IN THIS TRANSACTION EACH CERTIFY THAT THE TERMS OF THIS CONTRACT ARE TRUE TO HIS/HER/THEIR BEST KNOWLEDGE OR BELIEF AND THAT ANY OTHER AGREEMENT ENTERED INTO BY ANY OF THESE PARTIES IN CONNECTION WITH THIS TRANSACTION IS ATTACHED HERETO.

THIS FORM IS PRODUCED AND COPYRIGHTED BY THE ARKANSAS REALTORS ASSOCIATION. THE SERIAL NUMBER BELOW MUST BE A UNIQUE NUMBER TO ANY OTHER FORM OR THIS FORM MAY HAVE BEEN POSSIBLY ALTERED. DO NOT SIGN THIS FORM IF IT IS BEING USED PAST DECEMBER 31, 1994. Form Serial Number 164 04-87.5 71

The above contract is executed on _____ at _____.

_____    _____    _____    _____
Selling Agent Firm    Supervising Broker    Buyer    Social Security #

_____    _____    _____    _____
Selling Agent        Buyer                Social Security #
The above contract is accepted on _____ at _____.

_____    _____    _____    _____
Listing Agent Firm    Supervising Broker    Seller    Social Security #

1544

_____    _____    _____    _____
Listing Agent        Print Seller's Name(s)    Seller    Social Security #