COUNCIL of CO-OWNERS FOR THE LAKESHORE
RESORT and YACHT CLUB HORIZONTAL
PROPERTY REGIME *v.* GLYNEU, LLC

06-354                                    240 S.W.3d 600

Supreme Court of Arkansas
Opinion delivered October 5, 2006

[Rehearing denied November 9, 2006.]

*Niswanger Law Firm, PLC,* by: *Stephen B. Niswanger,* for appellant.

*Hardin & Grace, P.A.,* by: *David A. Grace,* for appellee.

ROBERT L. BROWN, Justice. The appellant, Council of Co-Owners for the Lakeshore Resort and Yacht Club Horizontal Property Regime (Council), appeals from an order granting the motion to dismiss of the appellee, Glyneu, LLC. The Council raises several points for reversal. None of the points has merit, and we affirm.

The Council is an organization of condominium unit owners and was formed pursuant to the Arkansas Time Share Act and the Declaration of Horizontal Property Regime Master Deed and By-Laws for Lakeshore Resort and Yacht Club in Hot Springs. The Council owns approximately 20% of the time-share intervals in a lakefront condominium building in Hot Springs known as the Lakeshore Resort and Yacht Club Horizontal Property Regime (condominiums). The condominiums are located adjacent to a hotel now owned by Glyneu. The Council acquired its 20% ownership interest in the condominiums in 2001 from the former owners, known as the Kessler Class, in a foreclosure proceeding.

The condominiums and the hotel have been the subject of multiple lawsuits and appeals to this court. As a result, a complete recitation of the facts involved in this current appeal can be found in two previous opinions by this court — *National Enterprises, Inc. v. Kessler*, 363 Ark. 167, 213 S.W.3d 597 (2005), and *National Enterprises, Inc. v. Lake Hamilton Resort, Inc.*, 355 Ark. 578, 142 S.W.3d 608 (2004). What follows is a brief summary of the facts.

In 1983, Painters Point Development Company, L.P., developed the land into the resort that now includes the hotel and condominiums. Union Planters National Bank provided the financing for the development. In 1985, Painters Point conveyed the condominiums to Lakeshore Resort and Yacht Club Limited Partnership (Lakeshore Partnership), and Union Planters released its mortgage lien on the condominium property. Later in 1985, Painters Point and the Lakeshore Partnership entered into a license agreement which allowed Lakeshore Partnership and its condominium owners to use the hotel's recreational amenities and parking. A memorandum of the agreement was recorded in the real estate records.

Lakeshore Partnership then sold approximately 20% of the condominiums to a group of people now known as the Kessler Class, and 80% of the condominiums were acquired by its general partner — Hanson, Hooper & Hays, Inc. (Hansen Hooper). In 1988, Union Planters foreclosed on Painters Point's interest in the hotel, and a foreclosure decree was entered in 1990. The hotel property was purchased at the foreclosure sale and ultimately sold to Lake Hamilton Resort.

In 1993, the mortgagee's successor in interest for the Hansen Hooper purchase began foreclosure proceedings on the 80% condominium interest. National Enterprises, Inc. bought the note and mortgage. Lake Hamilton Resort offered $275,000 to National Enterprises for the note and mortgage, and National Enterprises counter offered for $1 million. Lake Hamilton Resort considered the counter offer "totally off base," and negotiations terminated.

In December 1993, Lake Hamilton Resort advised National Enterprises and the Kessler Class that they could no longer use the hotel's parking and recreational amenities and that utilities to the condominiums would be disconnected. National Enterprises, which by now had purchased the 80% interest in the condominiums, sued Lake Hamilton Resort to enforce the license agreement

and easements by necessity for utility usage and ingress and egress. The trial court ruled in its 1994 order that any rights National Enterprise might have had under the license agreement were foreclosed by the 1990 foreclosure decree. The court further found that the warranty deed executed to National Enterprises's predecessor in interest did not contain any grants of easement over the hotel property and that there was no implied easement by necessity or prescriptive easement for use of the utilities.

In August 2005, Glyneu, an Arkansas limited liability company, purchased the hotel at a foreclosure sale. The Council, which had since acquired 20% of the condominiums from the Kessler Class, filed suit against Glyneu for a declaratory judgment that the Council had the right to use the hotel's recreational amenities, parking, and utilities and that the 1990 foreclosure decree did not affect those rights. The circuit court granted Glyneu's motion to dismiss, based on its prior decision in the 1994 order. The Council now appeals.

*I. Dismissal Under Either the 1994 Order or the Kessler [1] Decision.*

The Council makes three distinct arguments under this point. First, it claims that neither the 1994 order nor the *Kessler* decision is *res judicata* as to the Council's current cause of action. It also asserts that the 1994 order has no *stare decisis* effect. Finally, it contends that the *Kessler* decision also has no *stare decisis* effect. Glyneu responds that, though it may apply, the circuit court's dismissal was not based on *res judicata*. Glyneu argues that the record clearly shows that the circuit court based its decision on the doctrine of *stare decisis* in deciding to follow its own precedent established in the 1994 order.

The Council first contends that *res judicata* should not apply in this case because it was not a party to the 1994 order nor to the *Kessler* decision. The doctrine of *res judicata* consists of "two facets,

---

[1] *National Enterprises, Inc. v. Kessler*, 363 Ark. 167, 213 S.W.3d 597 (2005). Kessler filed a class-action suit against National Enterprises as the developer's successor in interest, seeking restitution and rescission of purchase contracts based on misrepresentation and breach of contract. The circuit court granted summary judgment for the Kessler Class. National Enterprises appealed, and this court upheld the circuit court's ruling that National Enterprises was liable to the Kessler Class as a successor in interest, among other things, and remanded on the issue of damages.

one being issue preclusion and the other claim preclusion." *Beebe v. Fountain Lake School Dist.*, 365 Ark. 536, 231 S.W.3d 628 (2006). Claim preclusion bars the relitigation of a subsequent suit when five elements are met: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies. *See id.*

█ Regarding the 1994 order, the first four elements are met. It was a final judgment on the merits. The action was based on proper jurisdiction. It was fully contested in good faith, and the current suit involves the same cause of action. However, there is no evidence that the fifth element has been met. The two suits do not involve the same parties or their privies. The Council did not acquire its interest in the time-share from National Enterprises. Plus, the Council did not attempt to intervene in the 1994 action until 2000. The circuit court ruled that this attempt at intervention was untimely. Accordingly, the Council was not a party to the 1994 order, and there is no evidence that the Council is in privity with any party to the prior judgment. Therefore, claim preclusion does not bar the current suit.

Issue preclusion, or collateral estoppel, is the second facet of *res judicata*, and it bars the relitigation of issues that were actually litigated by the parties in a previous suit. *See Beebe, supra.* The issue must have been previously litigated and determined by a valid and final judgment, and the following four elements must be met: (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment. *See id.*

█ Furthermore, for collateral estoppel to apply, the party against whom the prior decision is being asserted must have had a full and fair opportunity to litigate the issue. *Craven v. Fulton Sanitation Serv., Inc.*, 361 Ark. 390, 206 S.W.3d 842 (2005). In this regard, this court has abandoned the requirement for collateral estoppel that both parties to a prior judgment must be bound for either to be bound. *See Fisher v. Jones*, 311 Ark. 450, 844 S.W.2d 954 (1993). One treatise discusses this development as follows:

> At one time, the utility of issue preclusion was limited by an additional requirement known as "mutuality of estoppel." Under

this concept, neither party to a lawsuit was bound by a prior judgment unless both were bound. In *Fisher v. Jones*, the Arkansas Supreme Court abolished mutuality when issue preclusion is asserted defensely, i.e., against a plaintiff who has previously litigated the same issue against a different defendant.

David Newbern & John J. Watkins, *2 Arkansas Practice Series: Civil Practice and Procedure* § 34.3 at 668 (4th ed. 2006). In the instant case, though the current issue is the same as that decided in the 1994 order, the Council did not have a full and fair opportunity to litigate the issue in 1994, since it was not a party to that action. Because this criterion was not met, issue preclusion does not decide this case.

The Council, however, also argues that the 1994 order has no *stare decisis* effect on the current case. We disagree. As a general rule, courts are bound to follow prior case law under this doctrine. *Low v. Insurance Co. of North America*, 364 Ark. 427, 220 S.W.3d 670 (2005). This court has said:

> We have held that there is a strong presumption of the validity of prior decisions. *Bharodia v. Pledger*, 340 Ark. 547, 11 S.W.3d 540 (2000). Although we do have the power to overrule previous decisions, it is necessary as a matter of public policy to uphold prior decisions unless great injury or injustice would result. *Id.* The policy behind *stare decisis* is to lend predictability and stability to the law. *Id.* In matters of practice, adherence by a court to its own decisions is necessary and proper for the regularity and uniformity of practice, and that litigants may know with certainty the rules by which they must be governed in the conducting of their cases. *Id.* Precedent governs until it gives a result so patently wrong, so manifestly unjust, that a break becomes unavoidable. *Id.*

*Union Pacific Railroad Co. v. Barber*, 356 Ark. 268, 287-88, 149 S.W.3d 325, 337 (2004).

In the case at hand, the issue before the circuit court in 2006 was essentially the same as that decided by the court in 1994. Both plaintiffs asserted that they were entitled to usage of the hotel's parking, recreational amenities, and utilities. In 1994, the trial court found that the license agreement providing for condominium usage of the hotel's recreational amenities and parking did not survive the 1990 foreclosure decree and that the only easement that existed was an easement for ingress and egress to the condominiums. Because the issue presented here is essentially the same as

that decided in the 1994 order, the court granted Glyneu's motion to dismiss, stating that it would not reverse its ruling in the previous order.

■ Moreover, we do not believe that great injury or injustice has occurred in this case. When the Council acquired the time-share intervals in 2001, it was aware of the 1994 order and knew of its effect on the condominiums. Thus, the Council cannot argue that the application of *stare decisis* is manifestly unjust when it had notice of the previous order. We hold that the circuit court correctly concluded that its decision was governed in this case by *stare decisis*.

■ As a final point, this court concludes that the *Kessler* decision does not have any effect on our decision today. *Kessler* involved a class-action suit against National Enterprises, as the developer's successor in interest, for rescission and restitution based on breach of contract and misrepresentation. The class was awarded money damages. The plaintiffs in *Kessler* acquired their interest in the condominiums before the license agreement for parking and recreational amenities was terminated. In the instant case, the Council does not seek money damages and has no claim for breach of contract or misrepresentation because it had notice that no easement for utility usage existed. *Kessler* is distinguishable and has no *stare decisis* effect on the current case.

## II. Change in the Law

The Council next maintains that the law has changed since 1994, and, therefore, the 1994 order is not *stare decisis*. To support this argument, the Council cites to the court of appeals decision, *Diener v. Ratterree*, 57 Ark. App. 314, 945 S.W.2d 406 (1997), for the proposition that an implied easement includes access to utilities that are reasonably necessary, even if those utilities are not visible to an adjoining property owner. Glyneu counters that *Diener* did not change the law with regard to implied easements. Rather, Glyneu asserts that *Diener* only reaffirmed the settled law that whether an easement is apparent and reasonably necessary are questions of fact for the fact-finder.

*Diener* involved a dispute between adjacent land owners concerning a septic system. The property was originally owned by one party, and a commercial building with restrooms served by an underground septic system was constructed on the land later

purchased by Ratterree. Lateral leach lines extending from the septic system ran under the property later purchased by Diener. The dispute arose when Ratterree opened a restaurant in the commercial building, and the increased usage of the restrooms caused sewage to rise to the surface of Diener's property.

Diener severed the lateral leach lines, and the parties filed actions against each other. The trial court found that a permanent servitude had been created on Diener's property. The court of appeals affirmed and ruled that the trial court's finding that the implied easement was obvious, apparent, and reasonably necessary for Ratterree's use and enjoyment of the land was not clearly erroneous. The court of appeals stated that apparent use does not necessarily mean actual visible use. *See Diener, supra.*

The Council relies on *Diener* for its argument that the law governing implied easements has changed. However, apart from the fact that *Diener* is a court of appeals decision, it is distinguishable on its facts. Diener purchased his property with at least constructive notice that an implied easement for the septic system existed. He did not inquire as to where the leach lines were located, but he knew that the commercial property adjacent to his land had to be served by a septic system because he was aware that there were no sewer lines in the area. The court of appeals wrote, "whatever puts a party upon inquiry amounts in judgment of law to notice, provided the inquiry becomes a duty as in the case of vendor and purchaser . . . ." *Id.* at 317, 945 S.W.2d at 408 (citing *Waller v. Dansby*, 145 Ark. 306, 306, 224 S.W. 615, 617 (1920)).

In this case, just the opposite occurred. Both the Council and Glyneu acquired their property with notice of the ruling in the 1994 order that no easement by necessity for utilities existed. The Council moved to intervene in the 1994 suit, albeit in untimely fashion. Thus, it was aware of the 1994 order and had both actual and constructive notice that no easement existed when it purchased the time-share intervals. Glyneu then purchased the hotel in reliance on the fact that no implied easement burdened the property based on the 1994 order. This is a totally different situation from what occurred in *Diener*, where the purchaser of the servient estate had constructive notice that his property was subject to an easement and the issue was whether he was bound by that notice. We conclude that the law has not changed with respect to the Council. The *Diener* facts and issues are simply different.

### III. Reexamination of the 1994 Order.

For its final point, the Council urges this court to reexamine the 1994 order and give the circuit court directions upon remand. The Council asserts that in 1994, the trial court erred in its ruling pertaining to parking, recreational amenities, and utilities. The Council further contends that the trial court erred in finding that the original parties did not intend to convey permanent rights that ran with the land. The Council claims, in addition, that the trial court did not properly balance the equities of the parties in 1994.

Glyneu, on the other hand, contends that this court should not review the 1994 order because doing so would amount to a mere advisory opinion concerning its merits. Glyneu also maintains that the Council's argument concerning the fairness of the order was not raised before the circuit court and cannot now be argued on appeal.

It is clear to this court that the Council's complaint is essentially a collateral attack on the 1994 order. This court has said that:

> A direct attack on a judgment is an attempt to amend it, correct, reform it, vacate it, or enjoin its execution in a proceeding instituted for that purpose. *Sewell v. Reed*, 189 Ark. 50, 71 S.W.2d 191; *Woods v. Quarles*, 178 Ark. 1158, 13 S.W.2d 617. An attack is direct where the proceeding in which it is made is brought for the purpose of impeaching or overturning the judgment, and collateral if made in any manner other than by a proceeding the very purpose of which is to impeach or overturn the judgment. *Brooks v. Baker*, 208 Ark. 654, 187 S.W.2d 169; *Wilder v. Harris*, 205 Ark. 341, 168 S.W.2d 804.

*Purser v. Corpus Christi State Nat'l Bank*, 256 Ark. 452, 459-60, 508 S.W.2d 549, 553 (1974).

The plaintiffs in the 1994 action failed to timely perfect an appeal and were barred from directly attacking the order. *See Lake Hamilton Resort, Inc.*, 355 Ark. at 584, 142 S.W.3d at 608. Judgments may not be collaterally attacked unless the judgment is void on the face of the record or the issuing court did not have proper jurisdiction. *See West v. Belin*, 314 Ark. 40, 858 S.W.2d 97 (1993); *Muncrief v. Green*, 251 Ark. 580, 473 S.W.2d 907 (1971). This court has said, "[a]bsent allegations of fraud or lack of jurisdiction, a judgment entered by a circuit court bears presump-

tive verity and may not be questioned by collateral attack." *Powers v. Bryant*, 309 Ark. 568, 571, 832 S.W.2d 232, 233 (1992). The Council has not alleged that the 1994 order was void on its face or that it was entered by a court without competent jurisdiction. A collateral attack, accordingly, is prohibited.

Even if this court were to reexamine the 1994 order, the final argument made by the Council was not preserved for appeal. The Council argues that the trial court in 1994 failed to properly and fairly balance the equities of the parties. However, the Council did not make this argument in its original complaint to the circuit court nor during the hearing. This court has said, "[i]t is well settled that this court will not consider arguments raised for the first time on appeal." *Cox v. Miller*, 363 Ark. 54, 210 S.W.3d 842 (2005). Hence, even if this court were to reexamine the 1994 order, it would not consider the "fairness" argument.

Affirmed.